# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 15, 2006          Decided June 16, 2006

No. 05-1095

COVAD COMMUNICATIONS COMPANY AND
DIECA COMMUNICATIONS, INC., *D/B/A* COVAD
COMMUNICATIONS COMPANY,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

CIENA CORPORATION, ET AL.,
INTERVENORS

———

Consolidated with
05-1100, 05-1101, 05-1108, 05-1110, 05-1122, 05-1130,
05-1133, 05-1137, 05-1224

———

On Petitions for Review of an Order of the
Federal Communications Commission

———

*Michael K. Kellogg* argued the cause for the ILEC
Petitioners. With him on the briefs were *Mark L. Evans, Sean
A. Lev, Colin S. Stretch, Scott H. Angstreich, William P. Barr,*

*Michael E. Glover, Edward Shakin, James D. Ellis, Gary L. Phillips, Christopher Heimann, James P. Lamoureux, Robert B. McKenna, Marc Gary, James G. Harralson*, and *Bennett L. Ross*. *Jennifer M. Kashatus* entered an appearance.

*Bruce D. Sokler* and *Genevieve Morelli* argued the cause for the CLEC Petitioners and Intervenors in support. With them on the briefs were *Michael H. Pryor, Fernando R. Laguarda, Brad E. Mutschelknaus, Steven A. Augustino, Jason Oxman, Andrew D. Lipman, Russell M. Blau, Eric J. Branfman, Patrick J. Donovan, Joshua M. Bobeck, David P. Murray, Randy J. Branitsky*, and *Thomas Jones*.

*Christopher J. White* argued the cause and filed the briefs for petitioner New Jersey Division of the Ratepayer Advocate.

*David C. Bergmann* was on the brief for petitioner National Association of State Utility Consumer Advocates.

*John E. Ingle*, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Acting Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, *Samuel L. Feder*, General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Associate General Counsel, and *James M. Carr* and *Christopher L. Killion*, Counsel.

*David P. Murray* argued the cause for CLEC Intervenors in support of respondents. With him on the brief were *Randy J. Branitsky, Thomas Jones, Bruce D. Sokler, Michael H. Pryor, Fernando R. Laguarda, Jason Oxman, Andrew D. Lipman, Russell M. Blau, Eric J. Branfman, Patrick J. Donovan, Joshua M. Bobeck, Brad E. Mutschelknaus, Genevieve Morelli*, and *Steven A. Augustino*.

*Michael K. Kellogg* argued the cause for ILEC Intervenors and Ciena Corporation in support of respondents. With him on the brief were *Mark L. Evans, Sean A. Lev, Colin S. Stretch, Scott H. Angstreich, William P. Barr, Michael E. Glover, Edward Shakin, James D. Ellis, Gary L. Phillips, Christopher Heimann, James P. Lamoureux, Robert B. McKenna, Stephen L. Goodman, Marc Gary, James G. Harralson*, and *Bennett L. Ross*.

Before: GINSBURG, *Chief Judge*, and SENTELLE and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: The Federal Communications Commission ("FCC" or "the Commission") has thrice attempted—unsuccessfully—to implement the "unbundling" provisions of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ("the Act" or "the 1996 Act"). This case involves a series of petitions for review of the FCC's fourth attempt. Because we conclude the Commission's fourth try is a charm, we deny all of the petitions for review.

I

The 1996 Act sought to foster a competitive market in telecommunications. To minimize the characteristics of natural monopoly in the market,[1] the Act gave the FCC broad powers to

---

[1] *See Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 544-45 (2002) (Breyer, J., concurring in part and dissenting in part) (describing the history and structure of the 1996 Act and inferring that Congress intended the 1996 Act to mitigate the incumbents' natural-monopoly advantages).

require incumbent local exchange carriers ("ILECs") to make unbundled network elements ("UNEs") available to competitive local exchange carriers ("CLECs"), 47 U.S.C. § 251(c)(3), (d); *see also id.* § 153(29) (defining a "network element" as "a facility or equipment used in the provision of a telecommunications service"). Thus, the Commission may require the ILECs to offer pieces of their networks as unbundled building blocks, which the CLECs can lease, repackage, and use to compete against the ILECs in telecommunications markets across the country.

Congress left to the Commission the choice of elements to be "unbundled," specifying that it must "consider, *at a minimum*, whether . . . the failure to provide access to such network elements would *impair* the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." *Id.* § 251(d)(2) (emphases added). Relying upon the implicit breadth of its "at a minimum" authority and its discretion to interpret the meaning of "impair[ment]," the FCC in this case amended its unbundling determinations for three types of UNEs: "switches" (devices that direct calls to their destinations in the same way switchboard operators once did), "transport trunks" (wires that carry calls between switches), and "local loops" (wires that run from switches over the "last mile" to consumers' telephones). The propriety *vel non* of those determinations is the crux of this case.

A

The basics of unbundling are relatively simple. Suppose a CLEC (such as Covad) wants to serve customers in Washington, D.C. One way of doing so is for Covad to purchase its own switches, trunks, and loops, which it can then use to offer service to its new customers. However, given that the local

ILEC (*e.g.*, Verizon) has already deployed switches, trunks, and loops to serve the market, it might be economically impossible for Covad to duplicate competitively Verizon's infrastructure. Through regulatory unbundling, however, Covad might be able to lease Verizon's switches, trunks, and loops as UNEs. Covad could then use combinations of UNEs to cobble together a network and compete against Verizon in Washington.

Under the Act, Covad must pay Verizon for every "facility" and every piece of "equipment" the former requests from the latter on an unbundled basis. *See id.* § 153(29); *id.* § 252(d)(1). After a hard-fought litigation battle, the Commission concluded that UNE prices must be based on each element's Total Element Long-Run Incremental Cost ("TELRIC"). *See* 47 C.F.R. § 51.505(b); *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 523 (2002) (upholding the FCC's TELRIC pricing methodology for UNEs as "a reasonable policy" choice). TELRIC rates are akin to wholesale prices because CLECs are supposed to be economically able to rent UNEs and then use them to sell telecom services to their retail customers.

The ILECs unsurprisingly dislike seeing their own networks wielded as competitive weapons by CLECs—especially when the CLECs enjoy access to UNEs at TELRIC rates. The ILECs therefore champion the use of substitute products that allow CLECs to compete without demanding access to the ILECs' individual network elements. For our purposes, the only relevant substitute product is the tariffed special access service ("TSAS"). Basically, Covad can purchase TSASs from Verizon (at prices *above* the TELRIC rates associated with UNEs), and the TSASs allow Covad to complete point-to-point calls over dedicated lines. *See, e.g., In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, Third Report and Order and Fourth Further Notice of Proposed Rulemaking, 15 F.C.C.R. 3696, 3912 (1999) ("*UNE*

*Remand Order*"). Thus, instead of purchasing or renting a loop, switch, space in a central office, and a transport trunk to complete a call, a CLEC might simply pay the higher TSAS rate for a dedicated line (which does not require separate switching or transport).

Given the lower cost of UNEs, the CLECs favor widespread unbundling, while ILECs favor fewer UNEs and the greater availability of higher-priced TSASs. This tug-of-war—between CLECs advocating more unbundling and ILECs advocating less—has been the nub of an ongoing, decade-long dispute between incumbents and their would-be competitors. To explain today's unbundling battle, we begin with the skirmishes that preceded it.

B

The ILECs' and CLECs' power struggle over UNEs began shortly after the passage of the 1996 Act. In its first attempt to interpret the Act's "impairment" standard, the Commission concluded that a CLEC was entitled to a given UNE "if the quality of the service the entrant can offer, absent access to the requested element, declines and/or the cost of providing the service rises." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15499, 15643 (1996).

The Supreme Court found this interpretation of "impair" unreasonable in two respects. First, the Commission had erroneously refused to consider whether a CLEC could self-provision or acquire the requested element from a third party. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 389-92 (1999). Second, the Commission had considered any increase in cost or decrease in quality, no matter how small, sufficient to establish impairment—a result the Court concluded could not be squared

with the "ordinary and fair meaning" of the word "impair." *Id.* at 389-90 & n.11. The Court admonished the FCC that in assessing which cost differentials would "impair" a new entrant's competition within the meaning of the statute, it must "apply some limiting standard, rationally related to the goals of the Act." *Id.* at 388 (emphasis omitted).

On remand from *Iowa Utilities*, the Commission ruled that a would-be entrant is "impaired" if, "taking into consideration the availability of alternative elements outside the incumbent's network, including self-provisioning by a requesting carrier or acquiring an alternative from a third-party supplier, lack of access to that element materially diminishes a requesting carrier's ability to provide the services it seeks to offer." *UNE Remand Order*, 15 F.C.C.R. at 3725. We held the Commission's "impairment" standard was unlawful because it did not differentiate between those cost disparities that a new entrant in any market would be likely to face and those that arise from market characteristics "linked (in some degree) to natural monopoly . . . that would make genuinely competitive provision of an element's function wasteful." *U.S. Telecom Ass'n v. FCC*, 290 F.3d 415, 427 (D.C. Cir. 2002) ("*USTA I*"), *cert. denied sub nom. WorldCom, Inc. v. U.S. Telecom Ass'n*, 538 U.S. 940 (2003). *USTA I* concluded that the Commission's broad concept of impairment failed to "balance" the costs and benefits of unbundling. *See id.* at 427-28.

*USTA I* also instructed the Commission to make nuanced impairment determinations. *Id.* at 422. Though the Act does not necessarily require the Commission to determine "on a localized state-by-state or market-by-market basis which unbundled elements are to be made available," *id.* at 425, it does require "a more nuanced concept of impairment than is reflected in findings . . . detached from any specific markets or market categories," *id.* at 426. Thus, the Commission is obligated to

establish unbundling criteria that are at least aimed at tracking relevant market characteristics and capturing significant variation.

On remand from *USTA I*, the Commission determined that a CLEC would

> be impaired when lack of access to an incumbent LEC network element poses a barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market uneconomic. That is, we ask whether all potential revenues from entering a market exceed the costs of entry, taking into consideration any countervailing advantages that a new entrant may have.

*In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 F.C.C.R. 16978, 17035 (2003) ("*Triennial Review Order*"). In response to *USTA I*'s demand for a more "nuanced" impairment standard, the Commission made an absolute national impairment finding, subject to specific exclusions (*i.e.*, findings of non-impairment) by state public utility commissions. *Id.* at 17058-59.

We invalidated much of the *Triennial Review Order* in *United States Telecom Association v. FCC*, 359 F.3d 554, 576 (D.C. Cir.) ("*USTA II*"), *cert. denied sub nom.*, *Nat'l Ass'n of Regulatory Utility Comm'rs v. United States Telecom Ass'n*, 543 U.S. 925 (2004). We concluded that the Commission's "touchstone" of impairment—"uneconomic" entry—was excessively vague. *See id.* at 572 ("Uneconomic by whom? By *any* CLEC, no matter how inefficient? By an 'average' or 'representative' CLEC? By the most efficient existing CLEC? By a hypothetical CLEC that used the most efficient

telecommunications technology currently available . . . ?" (emphasis in original) (internal quotation marks omitted)). Moreover, *USTA II* held the FCC could not lawfully implement a more "nuanced" (or "granular") impairment standard by adopting a blanket finding of impairment and then delegating power to state regulatory commissions to make non-impairment exceptions to the FCC's nationwide rule. *Id.* at 565-68. Instead, the FCC must establish unbundling criteria that take into account "relevant market characteristics," which capture "significant variation," *id.* at 563, sensibly define the relevant markets, *id.* at 563, 574-75, connect those markets to the FCC's impairment findings, *id.* at 574-75, and consider whether the "element in question" is "significantly deployed on a competitive basis," *id.* at 574. The fact that CLECs can viably compete without UNEs—for example, by utilizing the ILECs' TSASs—"precludes a finding that the CLECs are 'impaired' by lack of access to the element under § 251(c)(3)." *Id.* at 593; *see also id.* at 577.

C

On remand from *USTA II*, the Commission issued an interim order and notice of proposed rulemaking. *See* 19 F.C.C.R. 16783 (2004) ("*NPRM*"). The *NPRM* noted that our decision "called into question certain aspects of the Commission's unbundling framework, including the 'open-endedness' of the Commission's 'touchstone' of impairment—uneconomic entry . . . ." *Id.* at 16788. Accordingly, the FCC sought "comment on how to respond to the D.C. Circuit's *USTA II* decision in establishing sustainable new unbundling rules under sections 251(c) and 251(d)(2) of the Act." *Id.*

After receiving and considering comments, the FCC issued a four-part order, which is the subject of this case. *See In the*

*Matter of Unbundled Access to Network Elements*, Order on Remand, 20 F.C.C.R. 2533 (2005) ("*Order*"). We discuss each part of the *Order* in turn.

1

*First*, the Commission altered its unbundling framework. The FCC clarified that it would find "impairment" where it would be "uneconomic" for a "reasonably efficient" CLEC to compete without UNEs. *See id.* at 2547-49. The Commission explained:

> In analyzing entry from the perspective of the reasonably efficient competitor, we do not attach weight to the individualized circumstances of the actual requesting carrier. Thus, we do not presume that a hypothetical entrant possesses any particular assets, legal entitlements or opportunities, even if a specific competitive carrier in fact enjoys such advantages as a result of its unique circumstances. Similarly, under our approach, impairment does not arise due to any errors of business judgment made by an actual requesting carrier.

*Id.* at 2548 (footnotes omitted).

While the FCC presumes that a reasonably efficient competitor "will use reasonably efficient technologies and take advantage of existing alternative facilities deployment," *id.* at 2549, it need *not* utilize TSASs in the local exchange markets. *See id.* at 2546 (ruling it would be "inappropriate" to limit CLECs' "access to UNEs whenever a requesting carrier is able to compete using an" ILEC's special access services). *USTA II* held that the FCC "must consider" TSAS-based competition in its impairment inquiry for mobile wireless and long-distance UNEs, 359 F.3d at 577, because competition in those markets is

"robust," *id.* at 592. In contrast, "[t]he local services market does not share the competitive conditions, observed in the mobile wireless services market and long distance services market, that would support a parallel finding that the costs of unbundling outweigh the benefits." *Order*, 20 F.C.C.R. at 2556. Because the Commission concluded that UNEs are vital to the continued development of competition in the local exchange market, it retained its unbundling requirements, regardless of whether CLECs are currently using TSASs to provide local service.

2

*Second*, the Commission amended its impairment findings for dedicated interoffice transport. "Dedicated transport facilities" refer to facilities that are dedicated to a particular carrier used for transmission between or among ILEC wire centers. *Id.* at 2576. For purposes of this opinion, transport comes in two varieties: "DS1" (which can carry 24 voice calls simultaneously) and "DS3" (which has 28 times the capacity of DS1 facilities and can therefore carry 672 voice calls simultaneously).

CLECs often use DS1 transport as part of an end-to-end circuit, called an "enhanced extended link" ("EEL"), which can be used to serve a single customer (typically a small- or medium-sized business). *See USTA II*, 359 F.3d at 590. EELs are often composed of a DS1 loop combined with a DS1 transport link. After noting that it will "measure impairment with regard to dedicated transport on a route-by-route basis," *Order*, 20 F.C.C.R. at 2581-82, the Commission identified two proxies for determining whether entry into a particular market would be economic without unbundled DS1 or DS3 facilities: (i)

the extent of fiber-based collocation and (ii) business line density.[2]

The FCC found that CLECs are not impaired without DS1 transport links when both ends of the transport route terminate in "Tier 1" wire centers (*i.e.*, those with four or more fiber-based collocators or 38,000 or more business lines). Similarly, CLECs are not impaired without access to DS3 transport where both ends of the route terminate in "Tier 2" wire centers (*i.e.*, those with at least three fiber-based collocators or at least 24,000 business lines). *Id.* at 2575-76. The higher impairment threshold for DS1 transport reflects the fact that DS1 facilities have less capacity and generate less revenue (thus making them less likely to be deployed by CLECs).

If a CLEC self-certifies that a transport trunk meets the applicable test, the ILEC is obligated to offer immediate access to the trunk on an unbundled basis. *Id.* at 2665-66. If the ILEC seeks to challenge the propriety of unbundling the trunk, it must first provide the UNE and then raise a challenge through the dispute resolution procedures prescribed by the applicable interconnection agreements (*i.e.*, contracts between ILECs and CLECs).

3

*Third*, the Commission amended its impairment findings for DS1 and DS3 loops.[3] The Commission noted it is often not

---

[2] A fiber-based collocator is an arrangement that allows a CLEC to interconnect its facilities with those owned and operated by an ILEC. *See* 47 C.F.R. § 51.5. A business line is a loop that runs from the wire center to a business customer. *See id.*

[3] The definitions of DS1 and DS3 loops mirror those for DS1 and DS3 transport. Thus, DS1 loops can carry 24 individual voice calls

economical for a CLEC to deploy its own DS1 loops, given their capacity limitations.  *Id.* at 2616.  However, the FCC explained that to offer DS1 or DS3 service, CLECs "install high-capacity fiber-optic cables [including DS3 loops and "optical carrier level n," or "OCn," facilities] and then use electronics to light the fiber at specific capacity levels, often 'channelizing' these higher-capacity offerings into multiple lower-capacity streams." *Id.*  Thus, the FCC concluded, CLECs are not impaired without DS1/DS3 UNEs in markets where CLECs have deployed—or could economically deploy—higher-capacity facilities that can be "channelized" to provide service at lower levels.  *Id.* at 2625.

After noting that the relevant market for measuring impairment in DS1 and DS3 loops is the area served by a wire center, *id.* at 2619-20, the Commission again relied upon fiber-based collocators and business-line density as proxies for predicting impairment in high-capacity loop markets, *id.* at 2625-26.  Specifically, the Commission found that CLECs are not impaired without DS1 loops within the service area of a wire center that has at least four fiber-based collocators and at least 60,000 business lines.  Similarly, CLECs are not impaired without access to DS3 loops within the service area of a wire center containing at least four fiber-based collocators and at least 38,000 business lines.  *Id.* at 2614.  The higher impairment threshold for DS1 loops reflects the fact that DS1 facilities have less capacity and generate less revenue (thus making them less prone to deployment by CLECs).  *Id.* at 2628-29.  Loops are governed by the same implementation procedures that the Commission employed for dedicated transport.  *See id.* at 2665-66 (if CLECs self-certify that a DS1/DS3 loop meets the impairment thresholds, ILECs must offer immediate unbundled access and then litigate the issue before the state commissions).

---

simultaneously, and DS3 loops are equivalent to 28 DS1 loops and can carry 672 individual voice calls simultaneously.

4

*Fourth* and finally, the Commission concluded that ILECs no longer need to provide CLECs with unbundled access to mass market local circuit switching ("MMLS"). *See id.* at 2641-42. The FCC adopted transitional rules to wean CLECs off the local circuit switching UNEs that are currently in use. Specifically, the Commission afforded CLECs 12 months to eliminate their reliance on unbundled MMLS, *id.* at 2659-60, and it increased the rates at which ILECs are compensated for unbundled local switching during the transitional period,[4] *id.* at 2660-61.

D

Numerous parties filed petitions for review. Our review is governed by the classic two-step framework from *Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984): If Congress "has directly spoken to the precise question at issue," we "must give effect to [its] unambiguously expressed intent"; on the other hand, "if the statute is silent or ambiguous," we must defer to the Commission's interpretation so long as it is "based on a permissible construction of the statute." *Id.* at

---

[4] The Commission ordered that "unbundled access to local circuit switching during the transition period [shall] be priced at the higher of (1) the rate at which the requesting carrier leased [the unbundled network element-platform ("UNE-P")] on June 15, 2004 plus one dollar, or (2) the rate the state public utility commission establishes, if any, between June 16, 2004, and the effective date of this *Order*, for UNE-P plus one dollar." *Order*, 20 F.C.C.R. at 2660. UNE-P refers to a group of unbundled elements, which the CLECs typically use as a package to provide telecom services to their customers. The UNE-P package includes unbundled switching, loops, and transport. *See In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Notice of Proposed Rulemaking, 16 F.C.C.R. 22781, 22802 n.102 (2001).

842-43. Ultimately, if the Commission's reading of the statute is reasonable, *Chevron* requires us "to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2699 (2005).

Both the Supreme Court and our Court have held that the 1996 Act's use of the term "impair," 47 U.S.C. § 251(d)(2)(B), is ambiguous and should be reviewed under *Chevron*'s second step. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 387-92 (1999); *USTA I*, 290 F.3d at 422. Similarly, the Commission's reasonable interpretations of § 251(c) are entitled to deference. *Cf. USTA II*, 359 F.3d at 580. Under the Administrative Procedure Act, we will uphold the Commission's policy choices unless they are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). To survive review under this standard, the FCC "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In Part II below, we address and reject the ILECs' two challenges to the *Order*. In Part III, we address and reject the CLECs' three challenges to the *Order*.[5] In Part IV, we address and reject one miscellaneous argument raised by the New Jersey Division of the Ratepayer Advocate.

---

[5] As explained further in Part III, two of the CLECs' challenges are echoed in parallel petitions for review filed by the New Jersey Division of the Ratepayer Advocate and the National Association of State Utility Consumer Advocates.

16

II

The ILECs raise two challenges to the *Order*. First, the ILECs argue that the FCC unlawfully failed to consider the relevance of TSASs in its unbundling analysis. Second, the ILECs argue that the Commission imposed impossibly high thresholds for assessing the state of competition in the market for DS1/DS3 loops and transport. We reject both claims.

A

The ILECs first argue that the Commission unjustifiably concluded that it would be "inappropriate" to eliminate UNEs where CLECs are "able to compete using an incumbent LEC's [TSASs]." *Order*, 20 F.C.C.R. at 2536. The ILECs argue that to the extent TSASs allow viable competition, the Act's "impairment" requirement is not met, 47 U.S.C. § 251(d)(2), and unbundling is not required. In the ILECs' view, the Commission's conclusion to the contrary "violates this Court's mandate" from *USTA II*. Pet. Br. at 20.

We disagree. In *USTA II*, we reversed the FCC's decision to make UNEs available to providers of wireless services where CLECs' use of TSASs had allowed "competition not only to survive but to flourish." *USTA II*, 359 F.3d at 576. Noting that the use of special access had spawned similarly "robust competition" in the long-distance market, we declared that "the presence of robust competition" by users of special access "precludes a finding" that CLECs are impaired without UNEs in the wireless and long-distance markets. *Id.* at 592-93. We therefore held

that the Commission's impairment analysis must consider the availability of tariffed ILEC special access services

when determining whether would-be entrants are impaired . . . . This of course still leaves the Commission free to take into account such factors as administrability, risk of ILEC abuse, and the like. What the Commission may not do is compare unbundling only to self-provisioning or third-party provisioning, arbitrarily excluding alternatives offered by the ILECs.

*Id.* at 577.

Notwithstanding the ILECs' arguments to the contrary, the above-quoted holding does not apply with equal force to the local exchange markets. Unlike the "robust competition" that special access services have spawned in the wireless and long-distance markets, the FCC found that TSAS-based competition in the local exchange markets is much more "limited." *Order*, 20 F.C.C.R. at 2572. Nothing in *USTA II* specified how the Commission should analyze the impact of special access services in markets where competition is less than "robust." Instead, we entrusted that task to the agency's discretion and emphasized that the FCC was "free to take into account such factors as administrability, risk of ILEC abuse, and the like." *USTA II*, 359 F.3d at 577.

On remand, the Commission considered the viability of TSAS-based competition and concluded that "even in cases where [CLECs] currently compete using special access," a case-by-case TSAS-based impairment inquiry "would raise insurmountable hurdles regarding administrability . . . ." *Order*, 20 F.C.C.R. at 2575. The FCC found that such an inquiry "would require the Commission to examine all revenues [a CLEC] might hope to capture using the UNE or special access service at issue in a given market . . . and to compare those potential revenues against every relevant state and federal tariff and every [ILEC] retail and wholesale service offered in every

market at issue for every element or service," taking into account all "available term and volume discounts." *Id.* at 2566. Adding to the complexity of this endeavor, the prices and terms governing special access vary greatly from market to market. *Id.* at 2564. Given the apples-to-oranges nature of comparing TSASs nationwide, the Commission decided that evaluating the effect of special access on impairment in individual local markets "would be excessively complicated" and "utterly impracticable," "requiring resources far beyond those available to this Commission." *Id.* at 2566.

Moreover, the FCC found that a rule denying access to UNEs whenever tariffed alternatives are available would create an "unacceptable risk of significant abuse by [ILECs]." *Id.* at 2567; *see also USTA II*, 359 F.3d at 577 (suggesting that "on an appropriate record the Commission might find impairment" where the elimination of UNEs would pose a "risk of ILEC abuse" in the TSAS market). The Commission found record evidence that the availability of UNEs serves to discipline special access rates by exercising "a constraining influence" on the ILECs' ability to increase their TSAS rates. *Order*, 20 F.C.C.R. at 2574. Indeed, in an unrelated proceeding, the ILECs acknowledged this was the case. *See Merger of SBC Communications Inc. and AT&T Corp.*, Description of the Transaction, Public Interest Showing and Related Demonstrations, Feb. 21, 2005, at 105 & n.348. The Commission therefore found that the "elimination of UNEs would significantly risk increased special access pricing, undermining or destroying the ability to compete using tariffed alternatives." *Id.* at 2574-75; *see also Pub. Citizen. Inc. v. NHTSA*, 374 F.3d 1251, 1260-61 (D.C. Cir. 2004) ("Predictions regarding the actions of regulated entities are precisely the [types] of policy judgments that courts routinely and quite correctly leave to administrative agencies." (internal quotation marks and citation omitted)).

The Commission's analysis is reasonable. In contrast to the wireless and long-distance markets, "carriers generally make only limited use of special access offerings to provide service in the local exchange services market." *Order*, 20 F.C.C.R. at 2572. Moreover, in accordance with our instructions from *USTA II*, the FCC tempered its consideration of TSAS-based competition by "tak[ing] into account such factors as administrability, risk of ILEC abuse, and the like." *USTA II*, 359 F.3d at 577. Thus, the Commission "consider[ed]" the import of TSASs in its impairment inquiry, and it provided a reasoned explanation for its decision not to eliminate unbundling solely on the basis of limited TSAS-based competition. *Chevron*'s second step requires nothing more.[6] *See, e.g., Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995) (holding that when the Commission is obligated to consider certain factors, "[t]hat means only that [the FCC] must 'reach an express and considered conclusion' about the bearing of a factor, but is not required 'to give any specific weight' to it." (citation omitted)).

---

[6] The ILECs also challenge the Commission's adherence to its policy of allowing CLECs to convert TSASs to UNEs in markets where other CLECs have access to UNEs. *See Order*, 20 F.C.C.R. at 2661-64. As the Commission explained, "[t]he [ILECs'] arguments against conversions are essentially the same as their arguments for finding non-impairment wherever special access facilities are available," *id.* at 2663, and the Commission rejected both sets of arguments for essentially the same reasons. Given that an agency's policy decisions are entitled to deference so long as they are reasonably explained, *see Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 372 F.3d 454, 460 (D.C. Cir. 2004), and given the FCC's reasoned explanation of the administrability problems that a bar on conversions would cause, *e.g., Order*, 20 F.C.C.R. at 2664, we deny the petition for review as to this issue as well.

B

The ILECs' second argument is that competition is viable (and hence unbundling is both unnecessary and unlawful) in wire centers that have far fewer business lines and fiber-based collocators than required by the Commission's unbundling thresholds. *See Order*, 20 F.C.C.R. at 2575-76; *id.* at 2614-15. The ILECs argue that *USTA I* and *USTA II* require the FCC to "deny unbundling not only in markets that are already extremely competitive, *but also* in markets where the evidence shows that [CLECs] can compete without UNEs." Pet. Br. at 32 (emphasis in original); *see also USTA II*, 359 F.3d at 575 (noting the FCC must determine whether "competition is possible" without unbundling). However, in the ILECs' view, the Commission denied unbundling only in those markets that are experiencing "extraordinary levels of competition," without considering "the class of markets in which competition is *possible* without UNEs . . . ." Pet. Br. at 33 (emphasis in original).

Again, we disagree. Notwithstanding the ILECs' arguments to the contrary, the Commission repeatedly justifies its unbundling determinations on the basis of both actual *and potential* competition. *See, e.g., Order*, 20 F.C.C.R. at 2586 (The Commission "evaluate[s] impairment through a focus on wire centers, the end-points of routes, in a manner that accounts for both actual and potential competition."); *id.* ("The tests we adopt today are designed to capture both actual and potential competition, based on indicia of significant revenue opportunities at wire centers."); *id.* at 2587 ("Our approach here, though route-specific, is also consistent with [*USTA II*'s] instruction to make inferences about potential economic deployment on similarly situated routes. . . . For example, even if a particular [Tier 1] wire center exhibits few or no competitive fiber facilities, the fact that other wire centers displaying similar

economic characteristics tend to be the site of more significant competitive facilities deployment will serve as the basis for a reasonable inference that the wire center in question could potentially support such deployment."); *id.* at 2588 ("We have weighed carefully a variety of actual competitive indicia for determining impairment and determine that the best and most readily administered indicator of the potential for competitive deployment is the presence of fiber-based collocators in a wire center."); *id.* ("[W]e conclude that applying [the high-capacity transport thresholds] will better capture actual and potential deployment than any single measure."); *id.* at 2589 (Fiber-based collocation and business line density "measure the potential revenues available from a wire center. Wire centers that are rich in potential revenues will be counted similarly, capturing areas in which intermodal and intramodal competitors alike have incentives to deploy transmission facilities."); *id.* at 2591 ("[W]e reject MCI's proposal" for measuring impairment because "we find that it fails to account for areas of potential deployment, or to make any significant inferences" of potential competition.); *id.* at 2593 ("[O]ur test will capture . . . relatively smaller [wire centers] that, through fiber-based collocation, display signs of significant potential revenues."); *id.* at 2597 (defining Tier 1, Tier 2, and Tier 3 wire centers "based on indicia of the potential revenues and suitability for competitive transport deployment"); *id.* at 2605 ("Tier 1 wire centers are those characterized by very significant competitive facilities presence or potential, as measured by fiber-based collocation and business lines."); *id.* at 2606 (The Commission eliminates unbundling requirements in Tier 1 and Tier 2 wire centers for DS3 transport because, "due to the potential revenues available at the DS3 level, we find that scale economies sometimes are sufficient to recover the fixed and sunk costs of deploying transport facilities."); *id.* at 2620 ("Our choice of the wire center service area as the appropriate level of geographic granularity at which to assess requesting carriers' impairment without access to high-capacity loops is

grounded on [*USTA II*'s mandate that] the Commission . . . consider not only *actual* competition within a given market, but also *potential* competition within that market." (emphases in original)); *id.* at 2622 (The Commission rejects a building-specific impairment inquiry because that approach is "flawed by its failure to draw reasonable inferences from actual deployment regarding *potential* deployment." (emphasis in original)); *id.* at 2626 ("[H]igh business line counts and the presence of fiber-based collocators, when evaluated in conjunction with one another, are likely to correspond with actual self-deployment of [CLECs'] loops or to indicate where deployment would be economic and potential deployment likely."); *id.* at 2627 ("While the evidence does not (and could not) reveal a precise, immutable relationship between actual and potential deployment of high-capacity loops on the one hand, and the numbers of business lines and fiber-based collocators on the other hand, we adopt these proxies because they best minimize and balance any under-inclusiveness and over-inclusiveness.").

Notwithstanding the foregoing mountain of references, the ILECs argue that the FCC paid mere lip service to the potential for competition in the markets for both transport and loops. We reject both claims.

1

The ILECs complain that the Commission granted "exceedingly narrow transport relief." Pet. Br. at 33. Ironically, however, the Commission eliminated unbundling for high-capacity transport in *more* wire centers than the ILECs proposed. Specifically, the ILECs suggested—and the FCC rejected—a proposal to eliminate transport unbundling between wire centers that contain one or more fiber-based collocators. *See Order*, 20 F.C.C.R. at 2603. The Commission concluded that the ILECs' proposal would *underestimate* the potential for

competitive deployment and that unbundling was warranted for transport between wire centers that contained zero fiber-based collocators. *See id.* (eliminating unbundling in wire centers with zero fiber-based collocators if those wire centers have "a significant number of business lines [, which indicate] the presence of significant potential revenues").

To be sure, the Commission's chosen business-line thresholds (38,000 for DS1s and 24,000 for DS3s) are higher than the ILECs would have liked. However, as the Commission explained, the alternative thresholds proffered by the ILECs were too low—as an empirical matter—to support consistent competitive deployment. *See id.* at 2602-03. Given the fact that the Commission has "wide discretion to determine where to draw administrative lines," *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000), and given "the inevitability of *some* over- and under-inclusiveness in the Commission's unbundling rules," *USTA II*, 359 F.3d at 570 (emphasis in original), we have been "generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem." *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998) (internal quotation marks and citation omitted).

Here, the Commission applied its transport thresholds in a "disjunctive tandem" (that is, there is no impairment if the wire centers meet *either* the business line *or* the collocation metrics). *Order*, 20 F.C.C.R. at 2588. Because "complementary tests will capture markets [with] significant potential revenues and thus, the potential for further competitive build-out," the Commission concluded that a disjunctive test "will better capture actual and potential deployment than any single measure." *Id.* This analysis clearly bears *some* "relationship to the underlying

regulatory problem." As a result, we deny the ILECs' petition for review of the Commission's transport thresholds.

2

The ILECs' challenge to the Commission's unbundling of high-capacity loops is equally unavailing. Again, the FCC chose to assess loop impairment at the wire-center level because wire centers provide the best evidence of "not only *actual* competition within a given market, but also *potential* competition within that market." *Id.* at 2620 (emphases in original). Again, the ILECs complain that the FCC "removed high-capacity loop unbundling obligations only in a tiny subset of wire centers where there is evidence of extreme competition." Pet. Br. at 32. And again, we disagree.

After surveying the economic realities surrounding loop deployment, the Commission decided to apply its loop thresholds "in conjunction with one another" (that is, there is no impairment if a wire center meets *both* the business line *and* the collocation metrics). *Order*, 20 F.C.C.R. at 2626. The FCC concluded that a conjunctive application of the loop-impairment thresholds would "best minimize and balance any under-inclusiveness and over-inclusiveness" in its unbundling inquiry. *Id.* at 2627. Similarly, after surveying the economic differences between DS1 and DS3 loops, the FCC unbundled fewer of the latter than the former because "economic conditions surrounding competitive deployment of DS3-capacity loops permit [more optimistic] inferences regarding potential deployment in the context of DS3 loops that would not be appropriate in the context of DS1 loops." *Id.* Moreover, because it is generally economic to self-deploy a DS3 loop "when demand nears two DS3s of capacity to a particular location," the FCC imposed a one-loop limit on DS3s. *Id.* at 2631.

By contrast, the Commission ordered wider unbundling of DS1 loops because "[t]he record before us indicates that [CLECs] typically do not provision stand-alone DS1 loops . . . ." *Id.* at 2627. In light of evidence that CLECs generally provide DS1 service by "channelizing" a bigger DS3 loop, the Commission "denie[d] unbundled access to DS1 loops only in the areas served by wire centers where . . . [CLECs] actually have deployed, or will deploy, competitive facilities at the DS3 capacity level or higher, creating the potential for [CLECs] to channelize those facilities to offer service at the DS1 capacity level." *Id.* at 2628. Because it is generally more efficient for a CLEC to self-deploy a DS3 (and channelize it, if necessary) rather than use ten or more DS1-UNEs, the Commission imposed a ten-loop limit on DS1s. *Id.* at 2633.

Instead of attacking the FCC's thresholds or loop caps, the ILECs simply lament that the Commission eliminated unbundling only in those markets that are experiencing "extraordinary levels of competition." Pet. Br. at 33. Of course, the levels of competition in *non*-impaired areas (where competition is thriving at "extraordinary levels") are irrelevant for purposes of the ILECs' petition for review. The real question is whether the Commission ignored evidence of competition (either actual or potential) in *impaired* areas. After conducting a thorough analysis of the economic realities surrounding high-capacity loop deployment, the FCC concluded that some of the wire centers identified by the ILECs' alternative unbundling thresholds exhibit indicia of impairment because they "do not generally exhibit extensive competitive fiber deployment, and do not offer sufficient revenue opportunities to incent such deployment." *Order*, 20 F.C.C.R. at 2637. Tellingly, the ILECs never claim (much less show[7]) that

_____

[7] The ILECs attempt to shift the blame for this failure by arguing that the CLECs should suffer an "adverse inference" for their failure to disclose evidence within their control regarding deployment *vel non*

competition exists below the Commission's loop thresholds. *Cf.* Pet. Br. at 33 (claiming competition exists below the Commission's *transport* thresholds).

Congress gave the Commission—not the petitioners or this Court—discretion in regulatory line-drawing. The mere fact that the Commission's exercise of its discretion resulted in a line that the ILECs would have drawn differently is not sufficient to make it unlawful. The FCC's loop-impairment thresholds—combined with the loop caps—suggest that the Commission "confront[ed] . . . the issue" of the costs and benefits of unbundling and "ma[d]e reasonable trade-offs" between allowing unbundling where it is necessary and eliminating unbundling where it is not. *USTA I*, 290 F.3d at 425. We have never required anything more. Nor do we today.

## III

While the ILECs want less unbundling of high-capacity loops and transport trunks, the CLECs want more. To that end, the CLECs raise three arguments. First, the CLECs argue that they are universally impaired without unbundled access to DS1 loops, DS3 loops, and DS1 transport. Second, the CLECs argue that they are universally impaired without unbundled access to

---

of high-capacity loops. Again, however, the ILECs' arguments are misguided. Agreeing with comments filed by the ILECs themselves, the Commission adopted an *objective* wire-center test, which is based on publicly available data that neither party controls. *See Order*, 20 F.C.C.R. at 2619-22; *id.* at 2636-37. Because only non-proprietary data were relevant to the Commission's unbundling inquiry, there is no basis upon which to draw an adverse inference against the CLECs. *Compare Tendler v. Jaffe*, 203 F.2d 14, 19 (D.C. Cir. 1953) ("[T]he omission by a party to produce *relevant* and important evidence of which he has knowledge, and which is *peculiarly within his control*, raises the presumption that if produced the evidence would be unfavorable to his cause." (emphases added)).

mass market local switching. Third, the CLECs argue that the Commission's transitional rules for implementing the *Order* are arbitrary and capricious. We reject all three claims.

A

The CLECs first argue that it is economically impossible (and wasteful) for non-incumbents to supply high-capacity loops and transport trunks where the ILECs have already deployed them. Because "these fundamental economic facts" do not vary across markets, the CLECs argue that the Commission's unbundling thresholds are unlawfully high. Pet. Br. at 9. The CLECs mount separate challenges to the Commission's analysis for DS1 loops, DS3 loops, and DS1 transport. We address each in turn.

1

In the CLECs' view, the Commission erred by restricting the unbundling of DS1 loops. Given the FCC's finding that CLECs "cannot deploy stand-alone DS1-capacity loops on an economic basis," *Order*, 20 F.C.C.R. at 2628, the CLECs conclude that they must be impaired in (and thus entitled to unbundling of) DS1 loops nationwide.

We disagree. *USTA I* and *USTA II* require a nuanced application of a "granular" impairment standard, which incorporates competitive variations within and across markets. The CLECs appear to recognize this fact. *See, e.g.*, Pet. Br. at 14. Nonetheless, the CLECs advocate the most *un*-nuanced and *un*-granular impairment finding imaginable—namely, a nationwide unbundling decree—notwithstanding the fact that we *vacated* the CLECs' proffered alternative in *USTA II*. *See* 359 F.3d at 574; *see also Iowa Utils.*, 525 U.S. at 388 (holding the Commission cannot order blanket unbundling because "the Act

requires the FCC to apply *some* limiting standard, rationally related to the goals of the Act" (emphasis in original)); *USTA I*, 290 F.3d at 422 (criticizing the FCC's decision "to adopt a uniform national rule, mandating [an] element's unbundling in every geographic market").

In the order before us, the FCC rejected a nationwide unbundling rule—and reasonably so. Instead of a blanket impairment finding, the FCC adopted a nuanced standard, which assesses impairment *vel non* at the wire center level and imposes "caps" on unbundling in markets in which the prevalence of UNEs suggests that facilities-based competition is viable.[8] The Commission's standard uses market data to predict when and where the CLECs will be economically able to deploy their own high-speed facilities, thus obviating the need for UNEs. We think this balancing act is reasonable.

As a fallback position, the CLECs argue that impairment should be assessed on a building-by-building (as opposed to a wire center-by-wire center) basis. However, after chronicling extensive record evidence, the Commission concluded that a building-by-building approach would be an administrative nightmare, a font of endless litigation, and an ineffective metric of impairment. *See Order*, 20 F.C.C.R. at 2620-25.

Even if the CLECs' building-by-building approach were not riddled with empirical flaws and administrability problems, "the fact that there are other solutions to a problem is irrelevant provided that the option selected [by the FCC] is not irrational." *Ass'n of Pub.-Safety Commc'ns Officials-Int'l, Inc. v. FCC*, 76 F.3d 395, 400 (D.C. Cir. 1996) (internal quotation marks and citation omitted). "The FCC need not demonstrate that it has made the *only* acceptable decision, but rather that it has based its

---

[8] *See* Part II.B.2, *supra* (discussing the particulars of the FCC's thresholds and loop caps).

decision on a reasoned analysis supported by the evidence before the Commission." *Id.* at 398 (emphasis in original). "[I]f the [Commission] has offered a reasoned explanation for its choice between competing approaches supported by the record, the court is not free to substitute its judgment for that of the agency." *Id.*

Here, "the Commission has offered a reasoned explanation." The FCC explained that it chose to focus on wire centers, fiber-based collocation, and business line density because those variables are objective, easily verifiable, and highly correlated with both extant and potential levels of facilities-based competition. *See Order*, 20 F.C.C.R. at 2588-97. This explanation easily qualifies as "rational," "reasonable," and "non-arbitrary."

Even if the FCC explained its standard, the CLECs argue, that standard is nonetheless divorced from economic reality. In the CLECs' view, "[t]here is absolutely no evidence" to substantiate the purported correlation between competition and the level of fiber collocation and business line density within a wire center. Pet. Br. at 18. Moreover, the CLECs argue that even if fiber-based collocation can reasonably predict competition in enterprise markets, it is still insufficiently "granular" to predict competition for mass-market consumers. *Id.* at 19-20.

Again, the CLECs' argument is wide of the mark. As we have previously held, "collocation can reasonably serve as a measure of competition in a given market," particularly where it is "superior to the various alternatives proposed by petitioners." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001). Here, the CLECs "offer *no* alternative save a painstaking analysis of market conditions." *Id.* (emphasis added). For example, the CLECs argue that the FCC's

impairment analysis should incorporate "operational or structural impediments," Pet. Br. at 10, which are "specific to the customer's location *within a building*," *Order*, 20 F.C.C.R. at 2623 (emphasis added). Such a suggestion takes the concept of granularity to an unrealistic extreme: It defies common sense—and *USTA II*'s mandate—to require the Commission to conduct individualized inquiries into the economic particularities of each floor within each building served by the millions of DS1 loops nationwide. *See USTA II*, 359 F.3d at 577 (holding the FCC is "free to take into account such factors as administrability" in its impairment inquiry). Under these circumstances, the Commission is justified in its reliance upon what is "an admittedly imperfect measure of competition." *WorldCom*, 238 F.3d at 459.

Finally, even if the *Order* properly accounts for economic reality, the CLECs claim that the Commission arbitrarily "turn[ed] around and ignore[d]" its own "reasonably efficient competitor" standard in its refusal to unbundle DS1 loops. In the CLECs' view, the *Order* "relies on a [CLEC] holding . . . a fiber transmission network," Pet. Br. at 21, notwithstanding the fact that the Commission's "reasonably efficient competitor" standard "do[es] not presume that a hypothetical entrant possesses any particular assets." *Order*, 20 F.C.C.R. at 2548.

The CLECs either misunderstand or misconstrue the FCC's ruling. The *Order* does *not* presume that a particular CLEC possesses a fiber transmission network. Rather, the FCC presumes that under certain economic conditions, it would be financially possible and attractive for a "reasonably efficient" CLEC to deploy high-speed facilities. And where *a* "reasonably efficient" CLEC can economically deploy its own facilities, the FCC concludes, *all* CLECs are not "impaired."

At first blush, it might seem a little harsh to eliminate unbundling for all CLECs where one or more has demonstrated the economic feasibility of competing without UNEs. However, as the Commission explained, CLECs can use TSASs and other wholesale facilities "as a gap-filler" to enter or expand into new markets. *Id.* at 2623-24. And the CLECs' assertion that the wholesale supply of DS1 loops is "extremely limited," Pet. Br. at 22, is belied by the CLECs' own evidence confirming that they are "able to purchase wholesale capacity to serve a DS1 customer." *Order*, 20 F.C.C.R. at 2628. The ILECs corroborated the CLECs' concessions with respect to the availability of DS1 loops at wholesale prices. *See Ex parte* Letter from Evan T. Leo to Marlene H. Dortch, tbl. 9 (Oct. 4, 2004), Joint Appendix ("J.A.") 2067-68; Declaration of Claire Beth Nogay on behalf of Verizon, exh. 6 (Oct. 4, 2004), J.A. 1683-85. In the face of evidence that CLECs can—and do—offer DS1 services without UNEs, there is nothing unlawful about the FCC's well-reasoned refusal to order unbundling.

2

The CLECs next argue that the Commission erred by restricting the unbundling of DS3 loops. In a single footnote, the CLECs attempt to incorporate by reference all of their DS1-related arguments "to apply equally to single DS3 loops." Pet. Br. at 14 n.8. This reference is insufficient to raise the issue. *See Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 93 n.3 (D.C. Cir. 2002) ("On appeal, appellants failed to raise their . . . claim—a footnote at the end of their opening brief does not suffice."); *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc) ("We need not consider cursory arguments made only in a footnote.").

The CLECs' only viable DS3 challenge is their argument that "the FCC's proxies are an insufficient indicator of

competitive deployment." Pet. Br. at 19. However, the CLECs base their attack entirely on the alleged paucity of *extant* competition. *See id.* at 23 ("[T]he record plainly shows that the number of buildings where [CLECs] have deployed [DS3] facilities . . . is minuscule."). Because we have held that unbundling may be appropriate only after the Commission considers the *potential* for future competition, *see USTA II*, 359 F.3d at 575, the CLECs' complaints that *current* DS3 deployment is "minuscule" are wide of the mark. We therefore deny the petition for review with respect to DS3 loops.

3

The CLECs next argue that the Commission erred by restricting the unbundling of DS1 transport. In light of the same record evidence that informed the Commission's impairment analysis for DS1 loops, the FCC found that CLECs are not impaired without unbundled access to DS1 transport on routes between "Tier 1" wire centers. *See Order*, 20 F.C.C.R. at 2598; *id.* at 2605. The CLECs' challenge to this conclusion is feeble: They do not dispute that wire centers provide a perfectly reasonable metric to gauge transport impairment, Pet. Br. at 16, nor do they dispute that competitive transport is or can be self-provisioned between Tier 1 wire centers, *Order*, 20 F.C.C.R. at 2605. Nor do the CLECs dispute that those competitive transport facilities can be channelized to provide transport at the DS1 level. *See id.* at 2585-86. Instead, the CLECs argue that the Commission's impairment inquiry was based "solely on the unfounded prediction" that a *wholesale* market for DS1 transport might develop. Pet. Br. at 27.

The CLECs' characterization of the Commission's inquiry is inaccurate. After finding empirical proof that more than two-thirds of wire centers above the business-line threshold can attract four or more fiber-based collocators, *see Order*, 20

F.C.C.R. at 2598-99 & nn.322-23, the Commission inferred that it was "possible that *competitors can deploy* transport facilities to the remainder of the wire centers above this business line threshold," *id.* at 2599 (emphasis added). Thus, the Commission did not focus "solely" on the availability of wholesale transport—in fact, the FCC's impairment inquiry centered on the potential for CLECs to *self-deploy* DS1 transport. We therefore deny the petition for review with respect to DS1 transport.

B

The CLECs' second challenge pertains to the Commission's decision not to require unbundled access to mass-market local switching. *See Order*, 20 F.C.C.R. at 2641-61. "Local switching" is the modern-day equivalent of a switchboard operator: Computerized switches route a signal from a caller to a receiver. "Mass market" switching refers to phone calls made by or to residential consumers (as opposed to "enterprise" switching, which refers to calls made by or to business customers). In the *Order*, the Commission declined to order unbundling in MMLS. The CLECs—joined by National Association of State Utility Consumer Advocates ("NASUCA")[9]

---

[9] Because NASUCA presses the point at length in its briefs, we note that the association has standing. In *USTA II*, we held that "it is not at all self-evident from the record that NASUCA meets the associational standing criteria established in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 344-45 (1977)." 359 F.3d at 593-94 (parallel citations omitted). Here, by contrast, NASUCA has submitted an affidavit that demonstrates "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. Accordingly, NASUCA has associational standing to press its claims.

and the New Jersey Division of the Ratepayer Advocate ("NJDRA")—petition for review. We discuss and reject each petitioner's claims separately.

1

First, we reject the CLECs' challenge to the Commission's ruling on MMLS. The CLEC petitioners argue that a nationwide non-impairment finding must be vacated because it is insufficiently "granular." However, the mere fact that the Commission eliminated unbundling across the board does not make it unlawful: The "granularity" criterion does not require the FCC to manufacture regulatory variation where the record does not support it. *See USTA II*, 359 F.3d at 570 (holding the Commission need only adopt a granular rule if "there is evidence that markets vary decisively (by reference to [the FCC's] impairment criteria) . . .").

On the record before it, the Commission reasonably concluded that CLECs are not "impaired" without unbundled access to MMLS. In light of the fact that CLECs have deployed their own switches in 86% of the ILECs' wire centers across the country, J.A. 2047, and in light of the fact that CLECs are deploying high-tech switches that have "higher capacity and wider geographic reach" than the old switches employed by the ILECs, *Order*, 20 F.C.C.R. at 2646, the record suggests that it is neither "uneconomic" nor "wasteful" for CLECs to deploy their own switches, *USTA II*, 359 F.3d at 572-73. While other parts of the ILECs' networks might remain "bottleneck facilities," the CLECs' widespread deployment of switching technology suggests "competition is possible" without unbundled switches. *Id.* at 575; *see also Order*, 20 F.C.C.R. at 2646 (noting that CLECs are currently combining their own switching and the ILECs' unbundled loops to serve mass market customers in 137 of the nation's largest 150 metropolitan statistical areas).

Moreover, the Commission's prior impairment finding was based solely on the technical difficulties associated with connecting CLECs' switches with the ILECs' networks (a process termed "hot cutting"). *See Triennial Review Order*, 18 F.C.C.R. at 17277. Here, however, the Commission found (and the CLECs do not dispute) that the ILECs have made vast improvements in their hot cut procedures, thus making it easier and more financially attractive than ever for CLECs to deploy their own switches. *Order*, 20 F.C.C.R. at 2647-49.

Confronted with this record of competitive switch deployment, the CLECs failed to offer any explanations or contrary evidence. The CLECs insist that the Commission unduly focused on improvements in hot cuts while ignoring other "impairments faced by CLECs attempting to serve the mass market with their own switches." Pet. Br. at 36-37. However, the CLECs do *not* offer an explanation for what these other "impairments" might be. The CLECs also failed to offer evidence that it is "uneconomic" to serve mass market customers with switches that were originally deployed to serve enterprise customers. *See Order*, 20 F.C.C.R. at 2656-57. Moreover, the CLECs did "not rebut[] the evidence of commenters showing that [CLECs] in many markets have recognized that facilities-based carriers could not compete with TELRIC-based UNE-P, and therefore have made UNE-P their long-term business strategy." *Id.* at 2654. Given that UNE-P is a "completely synthetic" form of competition, *USTA I*, 290 F.3d at 424, the Commission reasonably eliminated switch unbundling. *See USTA II*, 359 F.3d at 572, 581-82 (noting that the FCC may reasonably use its "at a minimum" authority under § 251(d)(2) to encourage CLECs to invest in—and compete through—their own facilities). Therefore, we deny the CLECs' petition for review.

2

Second, we reject NASUCA's challenge to the Commission's ruling on MMLS. The Association argues that the ILECs have "conceded impairment" in some MMLS markets by submitting evidence of non-impairment in others. Pet. Br. at 15. That is, NASUCA argues that the ILECs should suffer a negative inference for each of the markets for which the incumbents did not submit data.

NASUCA's argument is without support in the relevant caselaw. *USTA I* and *USTA II* make clear that the burden of persuasion rests on the shoulders of the party that urges the Commission to find impairment. *See USTA I*, 290 F.3d at 425; *USTA II*, 359 F.3d at 570-71. And the rationale for our conclusion is simple: The plain text of § 251(d)(2) permits unbundling *only* where the Commission receives evidence that UNEs are "necessary" to prevent "impair[ment]" of the CLECs' competitive aspirations. Thus, the 1996 Act does not obligate the ILECs to prove non-impairment—it forces the CLECs to prove impairment.

In this case, there was no evidence of impairment in MMLS markets. The only evidence before the FCC (provided by the ILECs) suggested switches are "significantly deployed on a competitive basis." *USTA I*, 290 F.3d at 422; *see Order*, 20 F.C.C.R. at 2644-45 & n.545. NASUCA offers nothing to suggest otherwise. Nor does it dispute that the sole basis for the FCC's prior impairment finding (namely, the costliness of hot cuts) is no longer an issue. Given the lopsided record, the Commission reasonably declined to find impairment. Therefore, we deny NASUCA's petition for review.

3

Finally, we reject NJDRA's challenge to the Commission's ruling on MMLS. The Ratepayer Advocate argues that the Commission's "analytical construct for assessing mass market impairment"—namely, the "reasonably efficient competitor" standard—was not a "logical outgrowth" of the *NPRM*. Pet. Br. at 6. Without explaining how, NJDRA simply asserts that the *Order* "is a substantial and significant departure from the *NPRM*." *Id.*

NJDRA's argument is meritless. An agency's final rule need only be a "logical outgrowth" of its notice. *See Shell Oil Co. v. EPA*, 950 F.2d 741, 750-51 (D.C. Cir. 1991); *see also Env'l Integrity Proj. v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) ("[A]gencies [may not] use the rulemaking process to pull a surprise switcheroo on regulated entities."). Whether the "logical outgrowth" test is satisfied depends on whether the affected party "should have anticipated" the agency's final course in light of the initial notice. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 548-49 (D.C. Cir. 1983).

NJDRA should have anticipated the FCC's "reasonably efficient competitor" standard. In the *NPRM*, the FCC sought comment on how to respond to *USTA II*'s vacatur of the Commission's "open-ended[]" impairment inquiry into "uneconomic entry." *See NPRM*, 19 F.C.C.R. at 16788 (citing *USTA II*, 359 F.3d at 571-73); *see also USTA II*, 359 F.3d at 572 ("Uneconomic by whom? By *any* CLEC, no matter how inefficient? By an 'average' or 'representative' CLEC? By the most efficient existing CLEC? By a hypothetical CLEC that used 'the most efficient telecommunications technology currently available' . . . ?" (emphasis in original)). In response

to comments, the Commission answered *USTA II*'s questions by promulgating the "reasonably efficient competitor" standard. *See Order*, 20 F.C.C.R. at 2547. Given that the *NPRM* put interested parties on notice that the FCC wanted to answer our questions, and given that the *Order* answered our questions, the latter was easily a "logical outgrowth" of the former. Therefore, we deny NJDRA's petition for review.[10]

C

The CLECs' third challenge—echoed in NJDRA's petition—pertains to the FCC's transitional efforts to wean CLECs off unbundled access to ILECs' local switching. In the *Order*, the Commission authorized the ILECs to increase local switching prices over the next twelve months by $1 above the highest unbundled network element-platform rate approved by the relevant state commission. *See Order*, 20 F.C.C.R. at 2660-61. We reject the challenges filed by both the CLECs and NJDRA.

1

We first reject the CLECs' challenge to the Commission's transitional rules. The CLECs argue that the $1 rate increase violates the ILECs' unbundling obligations under § 271 of the Act. Under § 271, ILECs are obligated to offer unbundled local

---

[10] NJDRA also echoes the CLECs' challenge to the Commission's finding of nationwide non-impairment for MMLS. NJDRA argues that the FCC failed to provide a reasoned explanation for its decision: "Unexplained reliance upon inference upon inference, rather than actual granular analysis and evidence is not reasoned decision making. One can infer an elephant is a mouse . . . with a glandular problem." Reply Br. at 14 (ellipsis in original). While NJDRA's argument is somewhat less than clear, we reject it for the same reasons we rejected the CLECs'. *See* Part III.B.1, *supra*.

switching at "just and reasonable" prices, as a precondition to the incumbents' right to compete in nationwide long-distance markets. However, the CLECs argue that the Commission in this case unlawfully approved the ILECs' rate increase without analyzing whether a $1 hike would be "just and reasonable."

We need not reach the merits of the CLECs' claim because they waived it. "It is well established that issues not raised in comments before the agency are waived and this Court will not consider them." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002); *see also Nat'l Min. Ass'n v. DOL*, 292 F.3d 849, 874 (D.C. Cir. 2002). Here, the Commission put the public on notice of its proposed $1 rate hike. *See NPRM*, 20 F.C.C.R. at 16798. However, the CLECs cannot point to a single place in the record—and we could not find one—in which anyone objected to the rate hike as "unjust" or "unreasonable" under § 271. *Cf.* Pet. Br. at 41 (pointing to challenges to the transitional rules, but pointing to no comments that challenged the rate hike as "unjust," "unreasonable," or in any way objectionable under § 271); NJDRA Reply Br. at 10 (same). Accordingly, the claim is waived.

2

We next reject NJDRA's challenge to the Commission's transitional rules. NJDRA argues that the $1 increase was arbitrary because the FCC never disclosed any empirical justification for its calculation, and it ignored proffered alternatives, such as tinkering with the federal subscriber line charge. In NJDRA's view, "[t]his failure to address a material issue alone justifies setting aside the FCC's mass market decision." Pet. Br. at 13.

NJDRA's argument is meritless. The FCC "need not address every comment, but it must respond in a reasoned

manner to those that raise significant problems." *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997) (citing *Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1216 (D.C. Cir. 1983)). "The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984) (internal quotation marks and citation omitted); *see also City of Waukesha v. EPA*, 320 F.3d 228, 257-58 (D.C. Cir. 2003) (per curiam).

Here, the Commission placed all interested parties on notice that it was considering an increase in local switching rates equal to $1 over the UNE-P rate as a means of easing the transition to a world without unbundled switching. *See NPRM*, 19 F.C.C.R. at 16798. In its comments, NJDRA challenged the appropriateness of *any* rate increase, but it did *not* challenge the empirical justification for the specific rate increase proposed in the *NPRM*. *See, e.g.*, Comments of the NJDRA at 20-21, J.A. 953-54; Reply Comments of the NJDRA at 3-6, J.A. 2310-13. In response, the FCC explained its decision to adopt *a* rate increase, *see Order*, 20 F.C.C.R. at 2660-61, and "[t]his response demonstrates that the [FCC] considered and rejected petitioners' arguments . . . . This is all that the [Administrative Procedure Act] requires." *City of Waukesha*, 320 F.3d at 258.

## IV

Finally, we address a miscellaneous claim, raised only in NJDRA's petition, that the FCC cannot preempt state public utility commissions from regulating telecommunications carriers. In NJDRA's view, the Commission "failed to acknowledge, let alone respond and address" the Ratepayer Advocate's question of whether the 1996 Act "violates the U.S. Constitution with respect to Article 1 [*sic*] (separation of power

[*sic*]), Article [*sic*] V (equal protection of the law), Articles [*sic*] X and XI." Pet. Br. at 16. NJDRA further argues that the Act violates the nondelegation doctrine because the FCC's power to grant forbearance petitions, *see* 47 U.S.C. § 160, constitutes a legislative power to "eliminate, modify, or repeal substantive provisions of the Act." Pet. Br. at 18.

Again, the Ratepayer Advocate's argument is meritless. NJDRA's claim boils down to the proposition that the Act's preemptive force is unconstitutional *as applied*, notwithstanding the fact that the Act has *not been applied*. Given that we have already held that any preemption challenge must be raised (if at all) only after the FCC attempts to preempt a state commission's unbundling authority, *see USTA II*, 359 F.3d at 594, and given that the *Order* under review does not contain any reference to the Commission's preemptive authority (much less does it actually preempt anything), NJDRA's legal arguments are unripe at best. NJDRA's forbearance claim suffers from similar shortcomings: Because the *Order* did not forbear from enforcing a statutory requirement any more than it preempted a particular state action, NJDRA's petition for review is not ripe.

V

For the reasons stated above, each of the petitions for review is

*Denied.*