# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 17, 2008

Charles R. Fulbruge III
Clerk

No. 06-51697

LOGIX COMMUNICATIONS, L.P.,
Doing Business as Logix Communications,

                                        Plaintiff-Appellant,

v.

THE PUBLIC UTILITY COMMISSION OF TEXAS,
PAUL HUDSON, in His Official Capacity as
Chairman of the Public Utility Commission of Texas,
JULIE CAURTHERS PARSLEY, in Her Official Capacity as
Commissioner of the Public Utility Commission of Texas,
BARRY SMITHERMAN, in His Official Capacity as
Commissioner of the Public Utility Commission of Texas,

                                        Defendants-Appellees,

SOUTHWESTERN BELL TELEPHONE, L.P.,
Doing Business as AT&T Texas,

                                        Intervenor-
                                        Plaintiff-Appellee.

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, SMITH, and GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

On June 30, 2005, AT&T Texas ("AT&T") initiated an arbitration proceeding before the Public Utility Commission of Texas ("PUC") regarding its interconnection agreement with Logix Communications, L.P. ("Logix"), seeking post-interconnection agreement dispute resolution regarding unbundled network element ("UNE") declassification by wire center.[1] AT&T sought to establish that its method of determining the volume of business, and thus the necessity for UNE access, in the Texas market was correct. The PUC upheld AT&T's method of counting business lines in a wire center, and Logix challenged that determination. The district court, having jurisdiction over Logix's challenge pursuant to 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331, granted summary judgment for AT&T. We affirm.

I.

The Telecommunications Act of 1996 ("Act"), Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C. § 251 et seq., sought to open local telecommunication services to competition by allowing the Federal Communications Commission ("FCC") to require an ILEC to "unbundle" certain of their "network elements," such as loops, and lease them to other carriers for use in providing competing local services at substantially discounted, cost-based rates. 47 U.S.C. § 251(c)(3). In February 2005, the FCC issued the Triennial Review Remand Order ("TRRO"), 20 FCC Rcd. 2533 (2005), which addressed the scope of an ILEC's duty to provide UNE access to a competing local exchange carrier ("CLEC"), such

---

[1] A "wire center" is the central office of an incumbent local exchange carrier ("ILEC") such as AT&T; "loops" connect the "wire center" to the customer's premises. DS1's and DS3's are high-capacity facilities, each of which has the capacity to carry the equivalent of many individual voice-grade linesSSin engineering terms, "64 kbps-equivalents."

as Logix, under the Act.

The TRRO meant to provide a metric for determining when an ILEC's failure to provide CLEC's with UNE access would impair competition. See 47 U.S.C. § 251(d)(2)(B). The analysis looks to the volume of business in a particular wire center to determine impairment. The theory is that when business volume reaches a certain threshold, a CLEC could make enough money in an area such that "the CLEC has the incentive to install and operate its own fiber facilities, and thus there is no reason to require the ILEC to provide them." Cbeyond Commc'n, L.P. v. Pub. Util. Comm'n, No. A-05-CA-862-SS, 2006 U.S. Dist. LEXIS 7381, at *6 (W.D. Tex. Jan. 24, 2006) (citing TRRO ¶¶ 93-95).

II.

Logix challenges the district court's determination that AT&T's method of counting business lines in a wire center was correct. This case concerns how to count two types of telecom linesSSUNE loops and 64 kbps-equivalent, digital access linesSSunder the business line proxy set forth in 47 C.F.R. § 51.5. The PUC and the district court determined that all UNE loops and 64 kbps-equivalent, digital access lines count as business lines even if they do not serve business customers. We review state commission interpretations of the FCC's implementing regulations and summary judgments de novo. Southwestern Bell Tel., L.P. v. PUC, 467 F.3d 418, 421 (5th Cir. 2006).

The FCC defines a "business line" as

an incumbent LEC-owned switched access line used to serve business customers, whether by the incumbent LEC itself or by a competitive LEC that leases the line from the incumbent LEC. The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to the wire center, including UNE loops provision in combination with other unbundled elements. Among these requirements, business line tallies:

> (1) Shall include only those access lines connecting end-user cus-
> tomers with incumbent LEC end-offices for switched services,
>
> (2) Shall not include non-switched special access lines,
>
> (3) Shall account for ISDN and other digital access lines by count-
> ing each 64 kbps-equivalent as one line.  For example, a DS1 line
> corresponds to 24 64 kbps-equivalents, and therefore to 24 "business
> lines."

47 C.F.R. § 51.5.  The FCC uses this definition throughout the TRRO to establish

proxies for impairment, which in turn helps show where competition is sufficient

such that CLEC's have an incentive to provide their own facilities.  In particular,

the TRRO looks to the density of business lines:

> Business line density also is an administrable proxy for determining
> where significant revenues are available sufficient for competitors
> to deploy transport facilities, despite the fixed and sunk costs of de-
> ployment.  Wire centers that possess a high level of demand for tele-
> communications services are most likely to attract and support com-
> peting carrier transmission facilities that duplicate the incumbent
> LEC's network. . . .  Further, business lines are a more accurate
> predictor than total lines because transport deployment largely has
> been driven by the high bandwidth and service demands of busi-
> ness, particularly in areas where business locations are highly con-
> centrated.

TRRO ¶ 103.

## A.

Logix challenges the PUC's and the district court's determination that all

UNE loops, not just those serving business customers, count as "business lines."

Logix argues that the first line of the business line definition limits the remain-

der of the definition such that: (1) only business (as opposed to residential) lines

are counted; (2) the line must be a switched access line; and (3) whether the line

should be counted is not affected by whether the services are provided by an

ILEC or a CLEC leasing the line.

The remainder of the definition, according to Logix, is an elaboration of the first sentence and must comport with those three criteria. Logix claims the second sentence in the definition identifies which lines served by ILEC's and CLEC's should be candidates for meeting the business line criteria and clarifies that "incumbent LEC switched access lines" qualify.

Logix's reading of the definition is against its plain meaning. The first sentence goes to the definition of a business line. The second sentence repeats the definition of the business line from the first sentence and adds to that "the sum of all UNE loops, including UNE loops provisioned in combination with other unbundled elements," to arrive at the number of business lines at a wire center. 47 C.F.R. § 51.5 (emphasis added).

Only the first part of the business line count definition explicitly references serving business customers. The next clause, concerning UNE loops, makes no reference to businesses. The FCC knew how to demarcate lines used to serve businesses and did not do so in the case of UNE loops. The plain meaning of the business line count definition is that the number of business lines in a wire center is equal to the number of previously defined business lines in that center plus all UNE loops, even if those loops do not serve a business customer.

Logix next contends that, aside from the plain language, its reading most comports with the policy expressed in the TRRO. In particular, it reasons that the FCC understood that it was the higher revenue characteristic of business lines that made them appropriate to be counted in the impairment analysis for high-capacity loops and interoffice transport. This is a correct expression of the policy, but it ultimately provides no support for Logix's position.

As quoted above, the TRRO looks to business line density as a proxy for determining impairment, in the process distinguishing the number of business lines from the number of total lines. This does not mean that the TRRO is in

conflict with § 51.5, much less that it evidences a different policy.

AT&T and the PUC have persuasive responses to Logix's policy arguments. AT&T points out that the FCC counted all UNE loops when it formulated the rules. The PUC argues that counting all UNE loops regardless of the identity of the customer best comports with the goal of fostering competition, because it is the method used by the FCC itself to determine when impairment had been overcome to such a degree that CLEC's no longer need special unbundling agreements.

The FCC established various criteria to determine whether impairment existed at a wire center and thus whether unbundling would be required there. The number of business lines available at a wire center formed, in part, the basis for the thresholds established in 47 C.F.R. § 51.319. As the TRRO states, the "wire center data we analyze in this Order is based on ARMIS 43-08 business lines, plus business UNE-P, plus UNE-loops." TRRO ¶ 105. If the FCC counted all UNE loops, and not just those serving business customers, in coming to its conclusions about business line count thresholds for wire centers, it would make sense to use that same data in the real world. Therefore, when the FCC speaks, in the TRRO, of business line counts in respect of those lines serving as a proxy for impairment, it is referring to the "business line count" methodology of the business line definition.

The PUC argues that the reading advanced by Logix, that only UNE loops that served business customers should be counted as business lines, fails because it requires the count to be based on competitor-provided data that the FCC expressly rejected as a basis for the business line proxy in the TRRO.[2]

Logix responds by pointing out that AT&T does collect UNE loop use data

---

[2] See TRRO ¶ 105 ("[B]usiness line counts are an objective set of data that incumbent LECs already have created for other regulatory purposes. [B]y basing our definition in an ARMIS filing required of incumbent LECs, and adding UNE figures, which must also be reported, we can be confident in the accuracy of the thresholds . . . .").

in the Midwest. Alternatively, Logix insists that instead of counting all UNE loops as business lines, AT&T could use some objective factor to estimate how many UNE loops are being used to service business customers.

There is a problem with each suggestion. As to the former, the FCC based its impairment analysis on information already collected, not information that could be collected. And as to the latter, nowhere in the TRRO or the definition of business lines does the FCC speak of using a factor-based analysis of business line count.

The FCC goes further in its rejection of Logix's argument. Paragraphs 155-159 of the TRRO address the requisite granularity for impairment analysis. The FCC rejects building-by-building[3] analysis as that would require "collection and analysis of information that is not easily verifiable, and is often within the possession of competitive LECs." TRRO ¶ 158. Instead, the agency adopted a wire center level of granularity and looked particularly to the number of business lines in the wire center. Id. ¶ 155. This level of granularity was chosen even though "such a test may in some cases be under-inclusive . . . or over-inclusive." Id. ¶ 155. The FCC was comfortable with that, because it considered "not only actual competition within a given market, but also potential competition within that market." Id. ¶ 156.

Business lines were therefore chosen as easily administrable proxies for determining where significant revenue opportunities were available. The FCC chose wire centers, not commercial buildings, as the appropriate level of analysis. With this choice came the recognition of the imprecision of the method, but the FCC determined that, because it was measuring potential competition in addition to actual competition, a certain level of imprecision was acceptable. It fol-

---

[3] The FCC explicitly discusses its method in relation to an alternative method that would count the number of commercial buildings, i.e. where business customers were. TRRO at n.441.

lows that "over-counting" UNE loops by including those that serve residential customers along with those that serve business customers comports not only with the text of the rule but also with the policy underlying the TRRO.

## B.

Logix's second argument is that counting high capacity loops at the full digital equivalency, rather than by looking to end user of each line in the high capacity loop, is inconsistent with subpart (3) of the business line definition. See 47 C.F.R. § 51.5(3). In particular, Logix believes that only those lines in a high capacity loop that are (1) connected to an end-user business customer, (2) providing switched access service, and (3) provided by either the ILEC or CLEC leasing the UNE loop should be counted as business lines. Logix urges that if the FCC had wished to declare all high capacity services as Business Lines, it could have simplified the definition to say so. The FCC, however, does say so.

First, as discussed above, there is a distinction between the definition of a "business line" and the methodology of counting business lines for impairment purposes. In counting business lines, the FCC expressly chose not to look to end-users.

Second, the requirement at issue provides that "business line tallies . . . [s]hall account for ISDN and other digital access lines by counting each 64 kbps-equivalent as one line." 47 C.F.R. § 51.5. The regulation does not indicate that ILEC's or CLEC's should, for the first time, undertake building-by-building, end-user analysis. Instead, the plain language indicates that all lines in a high- capacity loop should count as business lines.

Logix argues that the illustration that follows supports its case. The illustration provides that "a DS1 line corresponds to 24  64 kbps-equivalent, and therefore to 24 'business lines.'" Id. Nowhere does this example require separating the 24 lines into those that serve business customers and those that do not.

Instead, it seems to illustrate just the opposite result by requiring that each 64 kbps-equivalent should be counted as a separate business line without reference to its use.[4]

## III.

The purpose behind the business line count methodology is impairment analysis, which aims at determining whether the market in a particular locale is robust enough to support unregulated competition. The FCC wanted to measure competition generally without the need for litigation or overly fact-based analysis. It should not be surprising that the method is not absolutely precise. Read as written, the regulation supports the PUC's interpretation.

AFFIRMED.

---

[4] The quotation marks around "business lines" at the end of the illustration also point in favor of the PUC. In common usage, quotation marks may be used ironically. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1868 (1986). Irony is sometimes used to "remov[e] the semantic security of 'one signifier: one signified.'" LISA HUTCHEON, IRONY'S EDGE: THE THEORY AND POLITICS OF IRONY 13 (1994). In other words, to use quotation marks as they are used in the definition is a method of referring to something, here 64 kbps-equivalents, that ordinarily would not be encapsulated in the ordinary, un-ironic use of the term "business line." Sometimes, a "business line" is a "switched access line used to serve business customers." For purposes of impairment analysis, however, "business lines" are all 64 kbps-equivalents in a high capacity loop.