**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 26, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

QWEST CORPORATION,

      Plaintiff-Appellant/Cross-
      Appellee,

v.

COLORADO PUBLIC UTILITIES
COMMISSION; RON BINZ, in his
official capacity as Chairman of the
Colorado Public Utilities Commission;
JAMES TARPEY, in his official
capacity as a member of the Colorado
Public Utilities Commission; MATT
BAKER, in his official capacity as a
member of the Colorado Public
Utilities Commission,

      Defendants-Appellees/Cross-
      Appellants,

and

CBEYOND COMMUNICATIONS,
LLC,

      Defendant-Intervenor -
      Appellee/Cross-Appellant.

-------------------------

FEDERAL COMMUNICATIONS
COMMISSION,

      Amicus Curiae.

Nos. 10-1187 & 10-1212

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:08-CV-02653-RPM)**

John M. Devaney, (John K. Roche with him on the briefs), of Perkins Coie LLP, Washington, D.C., for Plaintiff-Appellant/Cross-Appellee, Qwest Corporation.

Charles Eugene Watkins, III, Cbeyond Communications, LLC, Atlanta, Georgia (Mark A. Davidson, Holland & Hart LLP, Denver, Colorado, on the briefs for Cbeyond Communications, LLC; John W. Suthers, Attorney General, and David A. Beckett, First Assistant Attorney General, State Services Section, Denver, Colorado, on the briefs for Colorado Public Utilities Commission, Ron Binz, James Tarpey, and Matt Baker), for Defendant-Intervenor-Appellee/Cross-Appellant Cbeyond Communications, LLC.

Austin C. Schlick, General Counsel, Peter Karanjia, Deputy General Counsel, Richard K. Welch, Acting Associate General Counsel, and Laurel R. Bergold, Counsel, Washington, D.C., filed an amicus brief for the Federal Communications Commission.

Before **BRISCOE,** Chief Judge, **SEYMOUR** and **LUCERO**, Circuit Judges.

**BRISCOE**, Chief Judge.

Plaintiff Qwest Corporation (Qwest) and defendants Colorado Public Utilities Commission (CPUC), individual commissioners, and Cbeyond Communications, LLC (Cbeyond) (together, defendants), cross-appeal from the district court's decision construing 47 C.F.R. § 51.5, a Federal Communications Commission (FCC) regulation relating to local telephone service providers. In order to facilitate competition in the local telephone service market, federal law

requires incumbent local exchange carriers (ILECs), such as Qwest, to lease certain parts of their telecommunications networks to competitive local exchange carriers (CLECs), such as Cbeyond. ILECs are relieved of this obligation if, among other circumstances, the number of "business lines" in a local exchange reaches a certain threshold because, in the FCC's view, a sufficient number of business lines shows that it would be economic for CLECs to invest in their own infrastructure. The term "business line" and the method of counting business lines are defined in 47 C.F.R. § 51.5. The parties disagree as to which types of a particular network element—UNE loops—are included in the business line count. The district court held that UNE loops serving non-business customers are included in the business line count and that non-switched UNE loops are not included in the business line count. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

I

*Legal Background*

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.) (the 1996 Act), effected significant deregulation of local telephone markets. Prior to 1996, states typically granted monopolies in local service areas to a local exchange carrier (LEC). The LEC "owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the

3

transport trunks (wires carrying calls between switches) that constitute a local exchange network." AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999). The 1996 Act subjects the monopolist LECs (ILECs) to duties designed to facilitate market entry by new (i.e., competitive) LECs (CLECs). See id. Among other things, ILECs must lease certain network elements to CLECs on an "unbundled" basis and at reasonable rates.[1] 47 U.S.C. § 251(c). These leased network elements are called "UNEs" (unbundled network elements). The District of Columbia Circuit has described unbundling as follows:

> Suppose a CLEC . . . wants to serve customers in Washington, D.C. One way of doing so is for [the CLEC] to purchase its own switches, trunks, and loops, which it can then use to offer service to its new customers. However, given that the local ILEC . . . has already deployed switches, trunks, and loops to serve the market, it might be economically impossible for [the CLEC] to duplicate competitively [the ILEC's] infrastructure. Through regulatory unbundling, however, [the CLEC] might be able to lease [the ILEC's] switches, trunks, and loops as UNEs. [The CLEC] could then use combinations of UNEs to cobble together a network and compete against [the ILEC] in Washington.

Covad Commc'ns Co. v. FCC, 450 F.3d 528, 532 (D.C. Cir. 2006).

Congress delegated to the FCC the authority to determine the circumstances under which ILECs must provide particular network elements as UNEs. In making these determinations, Congress directed the FCC to consider, at a

---

[1] "Unbundled" means priced separately from other elements. See Iowa Utils., 525 U.S. at 394. ILECs are required to provide unbundled elements at "TELRIC" prices, which are lower than the prices ILECs would like to charge.

4

minimum, whether access to proprietary network elements is necessary and whether "the failure to provide access to [particular] network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it needs to offer."  47 U.S.C. § 251(d)(2).

The FCC's first three attempts at implementing a necessity/impairment test were invalidated, in relevant part, by the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit.  See Iowa Utils., 525 U.S. 366; U.S. Telecom Ass'n v. FCC, 290 F.3d 415 (D.C. Cir. 2002); U.S. Telecom Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004).  In 2005, the FCC tried a fourth time, issuing its Triennial Review Remand Order (the TRRO).  In the Matter of Unbundled Access to Network Elements, Order on Remand, 20 FCC Rcd. 2533 (Released Feb. 4, 2005), pet. for review denied, Covad, 450 F.3d 528.  In the TRRO, the FCC developed an impairment standard based in part on business line density.  The FCC reasoned that if sufficient potential to generate revenue existed, it would be economically feasible for CLECs to invest in their own facilities and thus they would not be "impaired" without access to UNEs.  The FCC also found a correlation between revenue opportunities and the number of

business lines and/or fiber-based collocators[2] in a wire center.[3]  Therefore, as the

FCC explained in its amicus brief in this case, "[w]hen the number of business

lines reaches a specified threshold, [CLECs] that operate in the area served by the

wire center are deemed to be economically capable of deploying their own high-

capacity loops and transport facilities (i.e., they are no longer 'impaired' without

access to those UNEs at cost-based rates)."  FCC Br. at 6-7.  Thus, the number of

business lines and/or fiber-based collocators in a wire center dictates whether an

ILEC must provide high-capacity loops and/or transport as UNEs.  Rather than

look at total lines in a wire center, the FCC decided to focus on business lines as

a proxy for development opportunities "because transport development largely

has been driven by the high bandwidth and service demands of businesses,

particularly in areas where business locations are highly concentrated."  TRRO ¶

103.  The specific impairment thresholds for high-capacity loops and transport are

set forth in 47 C.F.R. §§ 51.319(a)(4), (a)(5), and (e).

"Business line" is defined in 47 C.F.R. § 51.5.  The regulation provides, in

relevant part:

> Business line.  A business line is an incumbent LEC-owned switched
> access line used to serve a business customer, whether by the

---

[2] "A fiber-based collocator is an arrangement that allows a CLEC to interconnect its facilities with those owned and operated by an ILEC."  Covad, 450 F.3d at 535 n.2.

[3] A wire center is the area where an exchange carrier terminates its local lines.  See Harry Newton, Newton's Telecom Dictionary 940 (21st ed. 2005).

incumbent LEC itself or by a competitive LEC that leases the line from the incumbent LEC. The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements. Among these requirements, business line tallies:

(1) Shall include only those access lines connecting end-user customers with incumbent LEC end-offices for switched services,

(2) Shall not include non-switched special access lines,

(3) Shall account for ISDN and other digital access lines by counting each 64 kbps-equivalent as one line. For example, a DS1 line corresponds to 24 64 kbps-equivalents, and therefore to 24 "business lines."

47 C.F.R. § 51.5. The parties disagree as to which UNE loops are included in a wire center's business line count. Qwest contends that the business line count includes all UNE loops connected to a wire center. The defendants argue that the business line count includes only UNE loops that serve business customers and that are connected to switches.

*History of this matter*

State utility commissions, like the CPUC, are charged with determining whether particular wire centers within their jurisdictions exceed the impairment thresholds. In 2008, the CPUC made such a determination for Qwest's wire centers in Colorado. The CPUC interpreted 47 C.F.R. § 51.5 to include in the business line count only those UNE loops that served business customers and were connected to switches. This resulted in an impairment finding (and

7

consequent unbundling obligations) with respect to high-capacity loops and transport at certain of Qwest's Colorado wire centers.

Qwest disagreed with the CPUC's decision and filed a complaint for declaratory and injunctive relief against the CPUC and its individual commissioners in the United States District Court for the District of Colorado. Cbeyond intervened as an additional defendant. The district court entered a judgment declaring that the CPUC order was correct in part and incorrect in part, and ruling that non-business UNE loops are part of the business line count but non-switched UNE loops are not. Qwest and the defendants both appealed. At our invitation, the FCC filed an amicus brief. The FCC's position is that both non-business and non-switched UNE loops are part of the business line count.

II

*Standard of Review*

We review a state utility commission's and a district court's interpretation of the 1996 Act and its associated regulations de novo. Sw. Bell Tel. Co. v. Apple, 309 F.3d 713, 717 (10th Cir. 2002) (state commission); Metzger v. UNUM Life Ins. Co. of Am., 476 F.3d 1161, 1165 (10th Cir. 2007) (district court).

We must defer to the FCC's interpretation of its own ambiguous regulation, even if that interpretation is reflected only in an amicus brief. Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2260-61 (2011) ("In the absence of any unambiguous statute or regulation, we turn to the FCC's interpretation of its

8

regulations in its <u>amicus</u> brief.").  An agency's interpretation in a legal brief is entitled to deference "unless the interpretation is 'plainly erroneous or inconsistent with the regulations' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" Id. at 2261 (quoting Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 880-81 (2011) (internal quotations and alterations omitted)).  This type of deference is commonly described as Auer deference.  See Auer v. Robbins, 519 U.S. 452, 461-62 (1997).

III

*Does the number of business lines in a wire center include UNE loops that serve non-business customers?*

The first two sentences of the business line definition state:

A business line is an incumbent LEC-owned switched access line used to serve a business customer, whether by the incumbent LEC itself or by a competitive LEC that leases the line from the incumbent LEC.  The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements.

47 C.F.R. § 51.5.  Defendants argue that the definition of business line in the first sentence limits the phrase "all UNE loops connected to that wire center" in the second sentence, and that "all UNE loops" actually means only those UNE loops that also fit within the first sentence.  Thus, under the defendants' interpretation, only UNE loops that are used to serve business customers count towards the

9

number of business lines in a wire center. We agree with Qwest, the district court, and the FCC and hold that the second sentence means that all UNE loops—whether used to serve business or non-business customers—are included in the business line count.

We begin with the plain language of the regulation. Valley Camp of Utah, Inc. v. Babbitt, 24 F.3d 1263, 1270 (10th Cir. 1994). If the regulation's language is clear, "our analysis ends and we must apply its plain meaning." Thomas v. Metro. Life Ins. Co., 631 F.3d 1153, 1161 (10th Cir. 2001). If the regulation is ambiguous, then we look beyond the plain language, "examining [regulatory] intent and overall statutory construction." Id. A regulation is ambiguous "if it is 'capable of being understood by reasonably well-informed persons in two or more senses.'" Id. (quoting United States v. Hinckley, 550 F.3d 926, 932 (10th Cir. 2008)).

We conclude that 47 C.F.R. § 51.5 plainly states that all UNE loops count towards the number of business lines in a wire center.[4] Accord Logix Commc'ns, L.P. v. Pub. Util. Comm'n of Tex., 521 F.3d 361, 365 (5th Cir. 2008) ("The plain meaning of the business line count definition is that the number of business lines in a wire center is equal to the number of previously defined business lines in that

_____

[4] Because we conclude that the first two sentences of the business line definition are not ambiguous, we do not defer to the FCC's interpretation. Nonetheless, our interpretation of the regulation's plain meaning is consistent with the FCC's.

center plus all UNE loops, even if those loops do not serve a business customer."); see also Mich. Bell Tel. Co. v. Lark, No. 06-11982, 2007 WL 2868633, at *9 (E.D. Mich. Sept. 26, 2007) (determining that the state commission's ruling that only business UNE loops are included in the business line count "ignores the plain language of the regulation, and transforms an otherwise unambiguous phrase, 'all UNE loops,' to mean only some UNE loops").

The first sentence provides a general definition of business lines. The second sentence prescribes the procedure for determining number of business lines in a wire center. The second sentence clearly states that the number of business lines is equal to (1) "all incumbent LEC business switched access lines" plus (2) "the sum of all UNE loops connected to that wire center." 47 C.F.R. § 51.5 (emphasis added). The method of determining the number of business lines for impairment purposes is not to actually count the number of business lines as defined in the first sentence. Accord Logix, 521 F.3d at 367 ("[T]here is a distinction between the definition of a 'business line' and the methodology of counting business lines for impairment purposes."). Some UNE loops connected to the wire center could serve residential customers and, therefore, may not meet the first sentence's definition of business line. However, the fact that the method of counting business lines might be over-inclusive (and the business line count might include some lines that are not, in fact, business lines) does not render the counting method ambiguous.

11

A basic principle of statutory construction supports our conclusion that non-business UNE loops are part of the business line count. If an agency includes a term in one provision of a regulation but excludes it in another, this court will not presume that the term applies to the provision from which it is omitted. Atlas Tel. Co. v. Okla. Corp. Comm'n, 400 F.3d 1256, 1265 (10th Cir. 2005). In the definition's second sentence, the UNE loops subtotal is not modified by the term "business," whereas the incumbent LEC switched access lines subtotal is. 47 U.S.C. § 51.5 ("The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center . . . ." (emphasis added)). We assume that the FCC intended the "business" modifier to apply only where the FCC inserted it. Accord Logix, 521 F.3d at 365 ("The FCC knew how to demarcate lines used to serve businesses and did not do so in the case of UNE loops.").

Defendants contend that the first sentence's definition of business line limits the entire second sentence because the first sentence describes lines used "by the incumbent LEC itself or by a competitive LEC that leases the line from the incumbent LEC." 47 C.F.R. § 51.5. Essentially, defendants argue that the first sentence means: a business line is an ILEC switched access line used to serve a business customer, whether it is used by the ILEC or it is a UNE loop.[5] Defs.

-----

[5] Not all lines that CLECs lease from ILECs are UNE loops. See Defs.
(continued...)

12

Br. at 15.  The flaw in defendants' logic lies, again, in their view of the

relationship between the first and second sentences.  The first sentence makes

clear that a UNE loop or other leased line can be a business line.  The second

sentence prescribes the method of counting business lines.  As discussed supra,

the "number of business lines in a wire center" is not determined by counting the

number of lines that meet the first sentence's definition.  The number of business

lines in a wire center is determined by counting exactly those lines that the FCC

listed: (1) the sum of all incumbent LEC business switched access lines, plus (2)

the sum of all UNE loops connected to that wire center.

Because we conclude that the regulation is not ambiguous regarding

business and non-business UNE loops, we do not need to look beyond the

regulation itself, including to the TRRO.  Nonetheless, we have examined the

TRRO and conclude that it does not contradict our holding that non-business UNE

loops are included in the business line count.

In the TRRO, the FCC explained how it arrived at the impairment

thresholds codified in 47 C.F.R. § 51.319.  The FCC analyzed wire center data

---

[5](...continued)
Resp. Br. at 11 ("Special access, resale and state tariffs, as well as some private
agreements, are the remaining ways competitive LECs lease facilities from
Qwest.").  Therefore, a line that is used by "a competitive LEC that leases the line
from the incumbent LEC" is not necessarily a UNE loop.  47 C.F.R. § 51.5.  The
"whether . . . or by a competitive LEC" phrase does not appear to refer
specifically or exclusively to UNE loops.  Id.

13

"based on ARMIS 43-08 business lines,[6] plus business UNE-P,[7] plus UNE-loops." TRRO ¶ 105 (original footnotes omitted). The FCC used the modifier "business" to refer to the ARMIS 43-08 lines and UNE-P, but not the UNE loops. This supports our conclusion that the FCC intended for all UNE loops to be counted.

The defendants point to the TRRO's discussion of business UNE-P to support its argument that only business UNE loops count towards the business line threshold. The TRRO's separate mention of business UNE-P is somewhat confusing because the set "all UNE loops" necessarily includes all UNE-P. See Defs. Br. at 15. Ultimately, however, we do not consider the discussion of UNE-P in the TRRO particularly relevant because the regulation itself makes no mention of UNE-P.[8] The FCC looked at business UNE-P when developing its impairment thresholds, but did not direct state commissions to separately consider

---

[6] ARMIS is the FCC's Automated Reporting Management Information System. The ARMIS 43-08 report requires ILECs to report total switched access lines in service and to break that number down by business and residential switched access lines. See FCC Report 43-08 - Report Definition, at 8 (Dec. 2004), available at http://www.fcc.gov/wcb/armis/documents/2004PDFs/4308c04.pdf (hereinafter, ARMIS Report Definition).

[7] UNE-P is a UNE loop combined with UNE switching.

[8] Further, the regulation states that "UNE loops provisioned in combination with other unbundled elements" are part of "the sum of all UNE loops." 47 C.F.R. § 51.5. UNE-P is a UNE loop provisioned in combination with another unbundled element.

14

UNE-P when determining the number of business lines in a wire center. The language of the regulation is more important than the TRRO's explanation of how the FCC arrived at the threshold numbers, particularly because we can determine the plain meaning of "all UNE loops" without reference to the TRRO. We hold that a UNE loop is included in the business line count regardless of whether it is used to serve a business or non-business customer.

> *Does the number of business lines in a wire center include only UNE loops connecting end-user customers with ILEC offices for switched services?*

> The second and third sentences of the business line definition state:

> The number of business lines in a wire center shall equal the sum of all incumbent LEC business switched access lines, plus the sum of all UNE loops connected to that wire center, including UNE loops provisioned in combination with other unbundled elements. Among these requirements, business line tallies:

> (1) Shall include only those access lines connecting end-user customers with incumbent LEC end-offices for switched services,

> (2) Shall not include non-switched special access lines,

> (3) Shall account for ISDN and other digital access lines by counting each 64 kbps-equivalent as one line. For example, a DS1 line corresponds to 24 64 kbps-equivalents, and therefore to 24 "business lines."

47 C.F.R. § 51.5. Qwest and the FCC contend that the first two clauses of the third sentence apply to ILEC lines only and, therefore, that non-switched UNE loops are included in the business line count. Defendants argue that the third sentence's limitations apply to all access lines, whether ILEC lines or UNE loops.

15

First, we conclude that the regulation is ambiguous in this regard.  Second, we conclude that the FCC's interpretation is not plainly erroneous or inconsistent with the regulation, and we have been provided no reason to suspect that the FCC's brief does not reflect the agency's fair and considered judgment on the matter.  Therefore, although we are reluctant to afford such solicitude to an agency's amicus brief and we would not necessarily reach the same result if not required to defer to the FCC, cf. Talk Am., 131 S. Ct. at 2266 (Scalia, J., concurring) ("It is comforting to know that I would reach the Court's result even without Auer."), Supreme Court precedent requires us to defer to the FCC's interpretation.  See id. at 2261 (majority opinion).

The FCC contends that "the third sentence of the business line rule does not override the explicit directive in the second sentence that the business line count shall include 'all UNE loops.'"[9]  FCC Br. at 23 (footnote omitted).  In order to ensure that all UNE loops are included, "the first and second subsections of the third sentence are best read to relate solely to the first element of the business line count - 'all incumbent LEC business switched access lines.'"  Id.  This reading is not inconsistent with the regulation's language.  Defendants argue that the third sentence's limitations must apply to both ILEC lines and UNEs because the third sentence applies to "business line tallies."  Defendants argue that the term

[9] The FCC's interpretation also does not override the second sentence's directive that the business line count shall include all ILEC business switched access lines because that set is already limited to switched access lines.

16

"tallies" must refer to the two separate "tallies" established in the second sentence: incumbent LEC business switched access lines and UNE loops.  See Defs. Resp. to FCC Br. at 7-8.  We disagree.  The phrase "business line tallies" could also refer generally to business line counts.  This would mean that the third sentence provides modifications to the business line count established in the second sentence.

Defendants also argue that the FCC's interpretation is erroneous because it affords an inconsistent meaning to the word "all" in the second sentence.  Defendants' argument misses the mark.  The third sentence does not change the meaning of "all" when it provides adjustments to the business line count.  "All" means the same thing in both parts of the second sentence — it means that every ILEC business switched access line and every UNE loop is counted.  The third sentence then removes certain lines from that subtotal.[10]

The FCC's interpretation is also consistent with its explanation in the TRRO of how it developed the method of counting business lines.  In order to create an easily administrable standard, the FCC based business line counts on "an objective set of data that incumbent LECs already have created for other

_____

[10] A more legitimate criticism of the FCC's interpretation of clauses (1) and (2) would be that it renders them superfluous because there are already no non-switched ILEC lines in the subtotal established in the second sentence.  However, the defendants do not make such an argument.  Further, the third sentence begins with the phrase "among these requirements."  This suggests that the subsequent requirements might reiterate or duplicate previous requirements— as opposed to requirements introduced by the phrase "in addition to these requirements."

17

regulatory purposes." TRRO ¶ 105. These objective data were "an ARMIS filing required of incumbent LECs, and . . . UNE figures, which must also be reported . . . ." Id. The ARMIS filing requires ILECs to separately report their switched and non-switched access lines in service, see ARMIS Report Definition, but the filing relating to UNEs does not, see In the Matter of Local Telephone Competition and Broadband Reporting, 19 FCC Rcd. 22340, App. D (Released Nov. 12, 2004); see also FCC Br. at 22 (stating that reported UNE data "cover aggregate UNE loop figures – not just the subset of UNE loops that are connected to switches"). The FCC's interpretation of § 51.5 is consistent with existing reporting requirements, whereas the defendants' interpretation would require state utility commissions to obtain data relating to CLECs' use of UNEs in order to determine whether a UNE was connected to a switch or not. Such data is not generated for other regulatory purposes. Because the FCC's interpretation is not plainly erroneous or inconsistent with the language of the regulation, we must defer to the FCC's position and hold that the business line count includes UNE loops that are not connected to switches.

IV

The judgment of the district court is AFFIRMED in part and REVERSED in part. The district court's ruling that the business line count includes non-business UNE loops is AFFIRMED, and the district court's ruling that the business line count does not include non-switched UNE loops is REVERSED.