NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2712
_____

VERIZON PENNSYLVANIA INC.; VERIZON NORTH LLC*

v.

PENNSYLVANIA  PUBLIC UTILITY COMMISSION;
JAMES H. CAWLEY; KIM PIZZINGRILLI; TYRONE CHRISTY;
WAYNE E. GARDNER; ROBERT F. POWELSON,
IN THEIR OFFICIAL CAPACITIES AS COMMISSIONERS
OF THE PENNSYLVANIA PUBLIC UTILITY COMMISSION,
Appellants
*(Per Clerk's 7/14/11 Order)
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-08-cv-03436)
District Judge: Honorable J. William Ditter
_____

Submitted Under Third Circuit LAR 34.1(a)
May 29, 2012

Before:  RENDELL, FISHER and CHAGARES, <u>Circuit</u> <u>Judges</u>

(Opinion Filed June 5, 2012)
_____

OPINION OF THE COURT
_____

RENDELL, Circuit Judge.

The Pennsylvania Public Utility Commission ("PUC") appeals from the District Court's grant of summary judgment in favor of plaintiffs Verizon Pennsylvania Inc. and Verizon North LLC ("Verizon"). The PUC argues that the District Court erroneously construed 47 C.F.R. § 51.5, a Federal Communications Commission ("FCC") regulation relating to local telephone service providers. Deferring to the interpretation of that provision offered by the FCC as amicus curiae, we hold that the District Court properly granted summary judgment in favor of Verizon. Accordingly, we will affirm.

## I. Background

a.    *Legal Background*

Prior to 1996, incumbent local exchange carriers ("ILECs") operated as virtual monopolies in local telephone markets.[1] Through the Telecommunications Act of 1996, Congress sought to uproot these monopolies and generate competition among local telephone providers. *See Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 488 (2002). To facilitate entry into the market by new, competitive local exchange carriers ("CLECs"), the Act requires that ILECs lease certain network elements on an unbundled basis at regulated, cost-based rates.[2] 47 U.S.C. § 251(c)(3). This way, "it [is] easier for a

---

[1] "States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999).

[2] A "network element" is "a facility or equipment used in the provision of a telecommunications service." 47 U.S.C. § 153(35). "'Unbundled' means priced

2

competitor to create its own network without having to build every element from scratch." *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2258 (2011).

Congress charged the FCC with determining when ILECs must provide particular network elements on an unbundled basis. The agency has to consider, at a minimum, whether an ILEC's failure to provide access to such elements would "impair" a CLEC's ability "to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2). In its *Triennial Review Remand Order* ("*TRRO*"), the FCC recognized a "correlation between the number of . . . fiber collocations in a wire center[3] and a revenue opportunity sufficient to lead to facilities duplication in the geographic area served via that wire center." *In the Matter of Unbundled Access to Network Elements*, Order on Remand, 20 FCC Rcd. 2533, 2559 (2005). "Based on that finding, the FCC used the presence of such CLEC collocations as a proxy for lack of impairment: When the number of fiber-based collocations in an ILEC wire center reaches a specified threshold, CLECs that operate in the area . . . [are] no longer 'impaired' without access to" unbundled network elements at regulated rates. FCC Br. at 6 (citing *TRRO*, 20 FCC Rcd. at 2588-94).

For purposes of impairment analysis, the FCC defined "fiber-based collocator" in 47 C.F.R. § 51.5. The regulation provides, in relevant part:

---

separately from other elements." *Qwest Corp. v. Colo. Pub. Utils. Comm'n*, 656 F.3d 1093, 1096 n.1 (10th Cir. 2011).

[3] "A wire center is the area where an exchange carrier terminates its local lines." *Qwest Corp.*, 656 F.3d at 1097 n.3 (citing Harry Newton, Newton's Telecom Dictionary 940 (21st ed. 2005)). "Collocation" refers to when CLECs lease space in an ILEC wire center for "equipment necessary for interconnection or access to unbundled network elements." 47 U.S.C. § 251(c)(6).

Fiber-based collocator. A fiber-based collocator is any carrier, unaffiliated with the incumbent LEC, that maintains a collocation arrangement in an incumbent LEC wire center, with active electrical power supply, and operates a fiber-optic cable or comparable transmission facility that

(1) Terminates at a collocation arrangement within the wire center;

(2) Leaves the incumbent LEC wire center premises; and

(3) Is owned by a party other than the incumbent LEC or any affiliate of the incumbent LEC, except as set forth in this paragraph. Dark fiber obtained from an incumbent LEC on an indefeasible right of use basis shall be treated as non-incumbent LEC fiber-optic cable.

47 C.F.R. § 51.5. The question on appeal is whether a particular type of collocation arrangement satisfies this definition and may therefore be included in the fiber-based collocator count that determines if an ILEC is relieved of its unbundling obligation.

b.      *Factual Background*[4]

Like other ILECs, Verizon owns wire centers in which CLECs may collocate in order to access the local telephone markets served by its wire centers. Unique to Verizon's wire centers are devices known as Competitive Alternative Transport ("CAT") Terminals. CAT Terminals permit carriers known as competitive fiber providers ("CFPs") to lease dark fiber strands within large capacity fiber-optic cables to other CLECs.[5] A CFP's fiber-optic cable enters a Verizon wire center through an entrance and

_____

[4] The parties' joint stipulations of fact before the District Court form the basis of our description of the technologies at issue.

[5] CFPs are not affiliated with Verizon. They are independent companies in the business of leasing dark fiber to CLECs as an alternative to the CLECs using Verizon's

4

exit called the "cable vault," where it terminates at the CAT Terminal.[6] The CAT

Terminal serves as a splice point, where the dark fiber strands in the CFP's fiber-optic

cable can be connected to other CLECs within the wire center.

CLECs that lease dark fiber strands from CFPs are not responsible for supplying,

installing, or maintaining the fiber-optic cables that run out of the wire center from the

CAT Terminal. Once leased, though, the dark fiber strands within those fiber-optic

cables become dedicated to the leasing CLEC. A CLEC that leases dark fiber strands

from a CFP must have its own collocation arrangement in the wire center. The

collocation arrangement must have active electrical power, and must contain optronics

equipment capable of lighting the dark fiber strands and enabling communications

signals, i.e., telephone or data traffic, to be transmitted into and out of the wire center.

The collocation arrangement connects to the dark fiber strands at the CAT Terminal

through a fiber-optic facility provided by the CLEC.

Verizon listed certain wire centers in Pennsylvania as exempt from the unbundling

requirement, counting both CFPs and CLECs leasing dark fiber strands from them as

"fiber-based collocators." A group of CLECs petitioned the PUC to review Verizon's list

of exempt wire centers, but the PUC declined their request and suggested the parties

mediate. After mediation efforts stalled, the CLECs invoked a procedure that allows the

---

or their own. "Dark fiber is fiber optic cable that has been deployed by a carrier but has not yet been activated through connections to optronics that 'light' it, and thereby render it capable of carrying communications." *TRRO*, 20 FCC Rcd. at 2607.

[6] Verizon makes space available to the CFP in its wire center and charges the CFP pursuant to its tariff for using the space to connect to the CAT Terminal.

PUC to answer hypothetical questions about the application of FCC rules, 52 Pa. Code § 5.302. The CLECs asked it to find that neither CFPs nor CLECs leasing their dark fiber strands qualify as "fiber-based collocators." The PUC ruled that CFPs qualify, but that CLECs leasing their dark fiber strands do not.

Verizon filed a complaint against the PUC in the District Court for the Eastern District of Pennsylvania, contending that the PUC erred by finding that CLECs that lease dark fiber strands from CFPs through CAT Terminals do not qualify as "fiber-based collocators." The District Court agreed. It construed the FCC's definition to encompass such CLECs, provided they lease the dark fiber strands pursuant to an "indefeasible right of use" ("IRU") and supply the optronics equipment needed to light the fiber and transmit traffic into and out of the wire center. On the basis of contracts submitted by intervening parties, the District Court found that CLECs leasing dark fiber from CFPs through Verizon CAT Terminals did so on an IRU basis.[7] Since the parties stipulated that those CLECs also supplied optronics equipment to light the dark fiber, the District Court granted summary judgment in favor of Verizon.

The PUC filed this timely appeal, contending that a CLEC must own a full fiber-optic cable or lease strands from an ILEC, and operate the cable or strands, in order to be considered a "fiber-based collocator" for impairment purposes. The PUC argues that

_____

[7] An indefeasible right of use is "an exclusive, long-term lease, granted by an entity holding legal title to a telecommunications cable or network, of a specified portion of a telecommunications cable, such as specified fiber optic strands within an optical fiber cable, or the telecommunications capacity of a cable or network, such as specific channels of a given bandwidth." *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1215 n.2 (10th Cir. 2005).

CLECs leasing dark fiber strands from CFPs via CAT Terminals satisfy neither condition and therefore cannot be included in Verizon's fiber-based collocator count. At our invitation, the FCC submitted an amicus brief. It urged that "the CLECs in this case are qualifying 'fiber-based collocator[s]' . . . [because] each . . . (1) has its own collocation arrangement in the Verizon wire center, (2) obtains dark fiber on an IRU basis from the CFP . . . , and (3) supplies its own collocated optronic equipment to activate the dark fiber and transmit communications into and out of the wire center." FCC Br. at 11.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review a state utility commission's and a district court's interpretation of the 1996 Act and its associated regulations de novo." *Qwest Corp. v. Colo. Pub. Utils. Comm'n*, 656 F.3d 1093, 1098 (10th Cir. 2011); *see also MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 517 (3d Cir. 2001) (declining to defer to a state utility commission's interpretation of federal law).

"In the absence of any unambiguous statute or regulation, we turn to the FCC's interpretation of its regulations in its *amicus* brief." *Talk Am., Inc.*, 131 S. Ct. at 2260-61. "We defer to an agency's interpretation of its regulations, even in a legal brief, unless the interpretation is 'plainly erroneous or inconsistent with the regulation[s]' or there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'" *Id.* at 2261 (quoting *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880-81 (2011)) (alteration in original). This type of

7

deference is commonly referred to as *Auer* deference, after the Supreme Court's decision in *Auer v. Robbins*, 519 U.S. 452 (1997).

## III.  Discussion

Whether CLECs that lease CFP dark fiber accessed through Verizon CAT Terminals are "fiber-based collocators" is not clear from the term's definition at 47 C.F.R. § 51.5.[8]  First, the regulation fails to indicate precisely what qualifies as a "fiber-optic cable or comparable transmission facility," such that it is unclear whether dark fiber strands leased from CFPs count.  Second, the regulation fails to specify what it means for a carrier to "operate[]" a cable or comparable facility, such that it is unclear whether use of optronics equipment to send signals out of a wire center suffices.

Since § 51.5 is ambiguous in these respects, we defer to the interpretation offered by the FCC because it is consistent with the regulation and reflects the agency's fair and

---

[8] To restate, § 51.5 defines "fiber-based collocator" as

> any carrier, unaffiliated with the incumbent LEC, that maintains a collocation arrangement in an incumbent LEC wire center, with active electrical power supply, and operates a fiber-optic cable or comparable transmission facility that
>
> (1) Terminates at a collocation arrangement within the wire center;
>
> (2) Leaves the incumbent LEC wire center premises; and
>
> (3) Is owned by a party other than the incumbent LEC or any affiliate of the incumbent LEC, except as set forth in this paragraph. Dark fiber obtained from an incumbent LEC on an indefeasible right of use basis shall be treated as non-incumbent LEC fiber-optic cable.

47 C.F.R. § 51.5.

considered judgment.  *See Talk Am., Inc.*, 131 S. Ct. at 2261.  Indeed, we would reach the same result absent such deference because Verizon's position better comports with the language of § 51.5 and the FCC's guidance regarding impairment analysis.  Accordingly, the District Court correctly concluded that a CLEC which leases dark fiber strands from a CFP on an IRU basis through a Verizon CAT Terminal satisfies each component of the definition set forth at § 51.5.  The PUC's arguments to the contrary are addressed in turn.

a.      *Is Dark Fiber a "Fiber-Optic Cable or Comparable Transmission Facility"?*

The PUC contends that dark fiber strands are neither a "fiber-optic cable [n]or [a] comparable transmission facility."  We read it to make two arguments in support of this contention: strands are not fiber-optic cables, they are part of such cables; and, only strands leased from an ILEC are comparable to fiber-optic cables.  We disagree.

To start, guidance from which the definition of "fiber-based collocator" arose indicates that the FCC considered dark fiber equivalent to a fiber-optic cable under certain circumstances.  In the *TRRO*, the FCC found that "fiber transmission facilities obtained on an . . . [IRU] basis from another carrier . . . shall be counted" as "non-incumbent LEC fiber-optic cable."  20 FCC Rcd. at 2593 n.292 (citing *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order and Order on Remand, 18 FCC Rcd. 16978, 17231-32 (2003)).  That dark fiber strands may qualify as such "fiber transmission facilities" is evidenced by the FCC's citation to a portion of the *TRRO*'s predecessor, the *Triennial Review Order* ("*TRO*").  There, the FCC stated: "when a company has obtained *dark fiber* from another carrier on a long-term IRU basis and activated that fiber with its own

9

optronics, *that facility should be counted as a separate unaffiliated facility*." *TRO*, 18 FCC Rcd. at 17231 (emphasis added).

The text of § 51.5 confirms the FCC's desire to treat dark fiber strands as a "fiber-optic cable or comparable transmission facility" under certain circumstances. In its definition of "fiber-based collocator," the FCC provided that "*[d]ark fiber* obtained from an incumbent LEC on an indefeasible right of use basis *shall be treated as non-incumbent LEC fiber-optic cable*." 47 C.F.R. § 51.5 (emphasis added). We do not interpret the agency's failure to similarly make special mention of leases from non-ILEC carriers as indicative of its intention to exclude such leases from the definition, as the PUC urges. Rather, specific mention of leases from ILECs was required if they were to qualify because ILEC-owned facilities are otherwise excluded from the definition. A similar complication does not inhere in the arrangement at issue here: a CFP from which dark fiber may be leased is "a party other than the incumbent LEC." *Id.* The FCC's treatment of dark fiber leases from ILECs serves only to debunk the notion that dark fiber leased from CFPs cannot be a "fiber-optic cable or comparable transmission facility."

The District of Columbia Court of Appeals' decision in *Covad Communications Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006), fails to counsel otherwise. According to the PUC, "*Covad* upheld [§] 51.5 based on 'ownership' and that requires that a CLEC's facilities must be its 'own facilities' not 'leased' facilities." Appellant Reply to Amicus Br. at 4. The PUC misreads the decision. The footnote in the *Covad* opinion to which it cites describes a fiber-based collocator as "an arrangement that allows a CLEC to interconnect its facilities with those owned and operated by an ILEC." 450 F.3d at 535

10

n.2. The court sought only to describe a typical collocation arrangement and did not purport to exclude all leases from the definition at § 51.5. Nor could it. Nowhere in the text of the "fiber-based collocator" definition is there a requirement that a carrier own the facility it operates to qualify; the facility must only be owned by a party other than the ILEC in whose wire center the carrier collocates. That condition is plainly satisfied here.

Indeed, the PUC's reliance on "ownership" conflicts with its recognition that dark fiber leased on an IRU basis from the ILEC itself qualifies as a fiber-optic cable. *See* 47 C.F.R. § 51.5; Appellant Reply Br. at 8. The PUC argues that it is the involvement of the ILEC that makes the dark fiber strands comparable to a fiber-optic cable, because the "ILEC . . . will be there for so long as the wire center is there." *Id.* However, the FCC's guidance indicates that it is the existence of an IRU generally — received from either the ILEC *or another carrier, like a CFP* — that is the critical component in determining whether dark fiber strands leased by a CLEC qualify it for treatment as a "fiber-based collocator" under § 51.5. *See TRRO*, 20 FCC Rcd. at 2593 n.292 ("[W]hen a company has collocation facilities connected to fiber transmission facilities obtained on an indefeasible right of use (IRU) basis *from another carrier, including the incumbent LEC*, these facilities shall be counted for purposes of this analysis." (emphasis added)). The District Court found that the CLECs involved here lease dark fiber strands from CFPs on an IRU basis, and the PUC does not dispute that characterization.[9]

---

[9] The PUC would have little basis upon which to dispute the existence of IRUs between the CFPs and the CLECs to which they lease dark fiber strands. The contract to which the District Court cited in support of its finding that IRUs exist states: "Grantee [CLEC] desires to be granted an exclusive, indefeasible right to use ("IRU") fiber optic

11

Accordingly, we adopt the FCC's interpretation of § 51.5's "fiber-optic cable or comparable transmission facility" language as covering dark fiber strands leased on an IRU basis from CFPs through Verizon CAT Terminals.[10] The agency's reading of that language is consistent with the regulation and reflects its fair and considered judgment.

b.       *Does a Carrier Who Lights Dark Fiber "Operate" the Cable or Facility?*

The PUC further argues that CLECs which lease dark fiber strands from CFPs do not "operate" a fiber-optic cable or comparable transmission facility. It contends that § 51.5 requires that fiber-based collocators exercise a greater level of control than do the CLECs by virtue of their ability to light the dark fiber strands using optronics equipment. Again, we disagree.

The PUC's argument relies upon the premise that at issue is the CLECs' control over the fiber-optic cable within which the dark fiber strands they lease are located. If that were the relevant question, its argument would have considerable force because, as stipulated by the parties, the leasing CLECs are not responsible for supplying, installing, and maintaining the CFP's fiber-optic cable. Having already deemed the dark fiber strands themselves the pertinent "fiber-optic cable or comparable transmission facility," however, the relevant question in our view pertains to the CLECs' level of control over

telecommunications fibers within Grantor's [CFP] System." The parties to the contract further defined "Grantee Fibers" as "the fiber optic filaments . . . in the Cable that Grantor has granted an IRU to Grantee."

[10] Once dark fiber strands leased by a CLEC on an IRU basis are deemed to constitute a "fiber-optic cable or comparable transmission facility," we have little difficulty finding that they "leave[] the incumbent LEC wire center premises" as required by § 51.5. Like the parties recognized in their stipulations of fact, when lit, the fiber strands enable the leasing CLEC to send communication signals out of the wire center.

only those strands.  The CLECs are required to install optronics equipment in Verizon wire centers that controls whether and when the dark fiber strands are activated for transmission of telephone and data traffic.  We agree with the FCC's determination that their control over the strands' activation constitutes "operation" of a fiber-optic cable or comparable transmission facility.

The FCC's interpretation of § 51.5 comports with the regulatory scheme and is entitled to deference. The purpose of the "fiber-based collocator" count is to identify areas where sufficient revenue opportunities exist to justify network duplication by CLECs, i.e., areas where CLECs are not impaired without access to unbundled elements. *See TRRO*, 20 FCC Rcd. at 2559.  In the *TRRO*, the FCC indicated that the investment required of CLECs to install and operate optronics equipment in ILEC wire centers is significant and "advances the facilities deployment goals of the [Telecommunications] Act."  *Id.* at 2609; *see also Ill. Bell Tel. Co. v. Box*, 2008 WL 4888996, at *11 n.8 (N.D. Ill. Aug. 11, 2008) ("[I]n determining impairment, the FCC values an individual CLECs deployment and 'lighting' of its own fiber, rather than merely the purchasing of an already lit facility.").  That is, the existence of enough CLECs with their own optronics equipment indicates that network duplication is feasible without access to unbundled elements.  Accordingly, it is consistent with the unbundling scheme's purpose to conclude that CLECs which lease dark fiber on an IRU basis through Verizon CAT Terminals satisfy the "operation" requirement of the "fiber-based collocator" definition.

Other courts and utility commissions specifically differentiate non-fiber-based collocators from the CLECs at issue here based on their inability to light dark fiber

13

strands.[11] *See, e.g.*, *Pac. Bell Tel. Co. v. Cbeyond Commc'ns, LLC*, 2008 WL 1994417, at \*10 (Cal. P.U.C. Apr. 24, 2008) ("A cross-connected CLEC that lacks *ownership of the optronics* . . . should not be counted . . . ." (emphasis added)).  The District Court for the Southern District of Indiana, for example, held that CLECs which cross-connect to another carrier's lit facilities does not "operate[]" a fiber-optic cable or comparable transmission facility.  *See Ind. Bell Tel. Co. v. Hardy*, 618 F. Supp. 2d 936, 940 (S.D. Ind. 2009).  The PUC emphasizes the court's finding that the term "operate" requires "some level of control or management," *id.*, to argue that merely lighting fiber does not suffice.  Appellant Br. at 29.  It ignores, however, the significance of the cross-connecting CLECs' inability to activate the fiber to the court's determination.  *See id.* at 941 ("In contrast [to a CATT arrangement], . . . the cross-connecting CLEC does not have the ability to light or maintain the fibers in its arrangement . . . .").  The distinction is an apt one that cannot so easily be neglected, given the importance attributed to it by the FCC.

We, therefore, agree with the FCC and District Court that a CLEC "operates" a fiber-optic cable or comparable transmission facility by activating dark fiber with its own optronics equipment.  At the very least, the FCC's interpretation of § 51.5 to allow for that conclusion is consistent with both the regulation itself and the overall unbundling scheme of which it is a part.  The PUC has offered no compelling reason to reject it as failing to reflect the agency's fair and considered judgment.

---

[11] Still other utility commissions, like the Ohio Public Utilities Commission, have concluded that CLECs qualify as "fiber-based collocators" under § 51.5 even if they only lease lit fiber from a party other than the ILEC.  *See In re XO Commc'ns, Inc.*, 2006 WL 1540270, at \*6 (Ohio P.U.C. June 6, 2006) ("Therefore, no requirement exists that the collocator has to own the optronics used to light the fiber transmission facility.").

14

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.