BROWN, Circuit Judge,
concurring:
Despite many points of agreement with my colleagues, I write separately because we converge from different paths and there are aspects of this case that — NIH’s insouciance notwithstanding — should trouble the heart. Even Dr. James Thompson, the researcher credited with being the first to successfully derive human embryonic stem cells, has admitted: “If human embryonic stem cell research does not make you at least a bit uncomfortable, you have not thought about it enough.” Gina Kolata, Man Who Helped Start Stem Cell War May End It, N.Y. Times, Nov. 22, 2007.
I. Chevron Deference
If this was ever a simple case it long ago ceased to be one. The judiciary, the executive branch, the scientific community, and numerous legal commentators have put forth disparate interpretations of the Congressional prohibition on the use of federal funds for stem cell research.[1] *788 Legislators, too, express conflicting views.[2] Disagreement is inevitable when what lies at the core of the dispute is a profound question about the boundaries of science— one that is irreducibly controversial because the slippery slope is precipitous in both directions. Ours, though, is not the legislative burden of bringing considered resolution to this contested question. We ponder a much narrower, much more prosaic query that serves only as a rough proxy for the metaphysics: does the Dickey-Wicker Amendment’s prohibition on federal funding of “research in which a human embryo or embryos are destroyed” or “knowingly subjected to the risk of death or injury,” Pub.L. No. 112-74, sec. 508(a)(l-2), preclude federal funding for all human embryonic stem cell research? And how much deference, if any, should be accorded to the agency’s view that stem cell research can be decoupled from the derivation of the stem cell line?
Every substantive decision in this case’s checkered past has proceeded under the assumption that Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), controls the statutory interpretation. I thus welcome — and heartily concur with — the portion of Judge Henderson’s concurring opinion dealing with this threshold determination. Like her, I conclude Chevron does not apply and the court should have accorded no deference to NIH’s interpretation. See AEM LLC dba Volks Constructors v. Sec. of Labor, 675 F.3d 752, 764-69 (D.C.Cir. 2012) (Brown, J., concurring). But in this case, deference is not dispositive. Judge Henderson finds the Amendment’s ban “plainly prohibits federal funding that the Guidelines expressly permit — namely, the funding of human embryonic stem cell (hESC) research that is conducted after destruction of the embryo.” Concurrence at 787 (Henderson, J.). I am not so sanguine. Judge Henderson’s reading is certainly plausible and undoubtedly consistent with the initial conclusion of the trial court that the language “reflects the unambiguous intent of Congress to enact a broad prohibition of funding research in which a human embryo is destroyed.” Sherley v. Sebelius, 704 F.Supp.2d 63, 70-71 (D.D.C. 2010). But it still does not tell us how to define “research” in light of the many layers of executive orders, agency interpretation, and legislative acquiescence with which we must now deal.
Congressional efforts to grapple with the ethical challenges arising from the extraordinary advances in biomedicine and biotechnology date back at least to the passage of the National Research Act in 1974. See Pub.L. No. 93-348, 88 Stat. 342. Since then, there has been no shortage of committees, boards, and panels all dedicated to the study and consideration of the moral, legal, and ethical dimensions of using human subjects, or human cellular or genetic materials, in scientific experiments.[3] More recently, Congress passed *789 the NIH Revitalization Act of 1993, Pub.L. 103 — 43, under which NIH established the Human Embryo Research Panel (“HERP”). While the bill’s focus was human reproductive biology, HERP concluded that “[rjesearch involving the development of embryonic stem cells [done] with embryos resulting from IVF treatment for infertility or clinical research that have been donated” was “acceptable” and could receive federal funding. Human Embryo Research Panel, Volume I of the Report of the Human Embryo Research Panel, 75-76 (September 1994).[4]
Congress passed the Dickey-Wicker Amendment in 1996 partially in response to some of HERP’s bolder recommendations, perhaps agreeing with the Washington Post that the Panel had gone “a step too far.” See Green, supra, at 224. The Amendment was not directed at the precise research at issue here,[5] but whatever the Amendment’s original purpose, President Clinton’s decision in 1999 to announce a policy of federal funding for embryonic stem cell research — and Congress’s decision to pass the Amendment unchanged the following year — altered the interpretive calculus. See Joint Appendix at 523. In the same vein, Congress’s decision to pass the Amendment unchanged for all eight years of the Bush Administration seems to confirm its acquiescence to some federal funding of research involving human embryonic stem cells.[6] Indeed, Congress supplemented this implicit approval of funding for embryonic stem cell research with contemporaneous Senate and House reports explicitly stating that the amendment “should not be construed to limit federal support for research involving human embryonic stem cells listed on an NIH registry and carried out in accordance with the policy outlined by the President.” NIH Br. at 14 (quoting H.R.Rep. No. 107-229, at 180 (Oct. 9, 2001)).
For this reason, I am of the view that de novo review would not change the outcome of the prior decision to affirm NIH’s interpretation of the act. I thus join in the judgment of the majority opinion though I would reach the decision using the more familiar clear error standard of review under which we must vacate the logic of the prior holding and supply our own should we find that the prior decision was “clearly erroneous and would work a manifest injustice.” LaShawn v. Barry, 87 F.3d 1389, 1395 (D.C.Cir.1996) (referencing Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). The facts in the record before us do not, however, rise to the level of these “extraordinary circumstances.” Id. That we have only now, some four-years and multiple opinions later, questioned the propriety of Chevron strongly suggests that the decisions of the reasonable jurists considering these matters were not “clearly erroneous.”[7]
*790 II. Failure to Reply to Comments
Although it is difficult to take issue with any part of the majority’s catechism on the agency’s refusal to respond to thousands of comments, the whole seems somewhat problematic. Obviously, the opportunity to comment is meaningless unless the agency responds substantively to significant points raised by the public. But the law of this Circuit is clear: an agency is only required to respond to comments if, for example, it can be established that the comment is “relevant to the agency’s decision and which, if adopted, would require a change in [the] agency’s proposed rule,” Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 n. 58 (D.C.Cir. 1977), or that a failure to respond would “demonstrate[ ] that the agency’s decision was not based on a consideration of the relevant factors,” Covad Commc’ns Co. v. FCC, 450 F.3d 528, 550 (D.C.Cir.2006). In applying this test, however, the majority defines “relevance” as coextensive with the President’s Executive Order and does so without imposing any clear limits on an agency’s ability to ignore comments that contravene the executive’s policy goals. I fear that without such boundaries there remains the distinct possibility that the executive power will expand at the expense of the APA’s regulatory scheme and judicial review will be reduced to rubber-stamping preordained results.
Clearly, if the Dickey-Wicker Amendment’s prohibition was unambiguous, NIH could not ignore an entire class of interpretive views because a broad reading of “research” would run counter to the executive’s agenda. Similarly, I do not think the agency could attempt to implement an expansive program Congress had explicitly rejected by deeming challenges to its authority irrelevant. But this is not the case here. As an initial matter, the comments Appellants argue were wrongfully ignored focus not on the text of Dickey-Wicker or the question of legislative authorization, but on the Executive Order’s (and the Guidelines’) requirement that only “responsible” and “scientifically worthy” research should be eligible for funding. Appellant Br. at 45. This is fundamentally a policy question and we must respect the Executive’s ability to reasonably define the contours of the proposed rulemaking. Nor is there a conflict between branches in NIH’s decision to couch their rejection in more absolute terms, i.e., declaring all comments “advocating a blanket ban on all funding for hESC research ... not relevant.’ ” See Joint App’x at 479-80. The NIH cannot be said to have acted arbitrarily and capriciously by refusing to reopen a debate that, as a practical matter, has been foreclosed for more than a decade. Because I ultimately reach the same result, I thus concur with the majority’s conclusion and leave the more technical questions of Executive Orders and deference for a later day.
The challenging — and constantly evolving — issues presented by bioethics are critical and complex. Striking the right balance is not easy and not, in the first instance, a task for judges. What must be defended is “the integrity of science, the legitimacy of government, and the continuing vitality” of concepts like human dignity.[8] Given the weighty interests at stake in this encounter between science and ethics, relying on an increasingly Delphic, decade-old single paragraph rider on an appropriations bill hardly seems adequate.

. See, e.g., Sherley v. Sebelius, 704 F.Supp.2d 63 (D.D.C.2010); Jenny Shum, Moral Disharmony: Human Embryonic Stem Cell Patent Laws, WARF, and Public Policy, 33 B.C. Int'L & Comp. L.Rev. 153, 163 (2010) ("Essentially, the amendment rendered any scientific research on hESCs ineligible for federal funding.”); Ronald Green, Political Interventions in U.S. Human Embryo Research: An Ethical Assessment, 38 J.L. Med. & Ethics 220, 224 (2010) ("Dickey-Wicker not only prohibits research that risks or destroys an embryo— applying to embryos whether in vitro or in útero the same protections applied to fetuses and even more stringent protections than those afforded children — but it defines the embryo as any organism produced by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes”); Maite S. Kollmann, Taking the Moral High Road: Why Embryonic Stem Cell Research Should Be Strictly Regulated, 2 Faulkner L.Rev. 145, 155 (2010) ("[NIH] General Counsel Rabb concluded that the Dickey-Wicker Amendment, which prohibited the use of funds allocated to the HHS for human embryo research, would not be applicable to research using hESCs 'because such cells are not a human embryo within the statutory definition.’ ”).

. In the Senate hearing convened to respond to the district court’s initial injunction in this case, Senator Wicker maintained that "if human embryonic stem cell research is to be done at all, it should be paid for with nontaxpayer funds.” The Promise of Human Embryonic Stem Cell Research: Hearing before S. Subcomm. on Appropriations, Statement of Sen. Roger Wicker, 111th Cong. 3-4 (2010). In the same hearing, Senator Feinstein excoriated the District court's "alarming" decision as "an unprecedented and highly restrictive interpretation of the Dickey-Wicker amendment.” The Promise of Human Embryonic Stem Cell Research: Hearing before S. Sub-comm. on Appropriations, Statement of Sen. Dianne Feinstein, 111th Cong. 33 (2010).

. The Ethics Advisory Board ("EAB”), for example, came into being in the late 1970s around the time scientists produced the first test-tube baby. The EAB focused on federal support for in vitro fertilization (“IVF”) and embryo transfer. See Ethics Advisory Board, Report and Conclusions: HEW Support of Research Involving Human In Vitro Fertiliza *789 tion and Embryo Transfer 1-7 (May 4, 1979), available at http://bioethics.georgetown.edu/ pcbe/reports/past_commissions/HEW_IVF_ report.pdf. For a list of other prominent past commissions, see O. Carter Snead, Science, Public Bioethics, and the Problem of Integration, 43 U.C. Davis L.Rev. 1529, 1539 n. 32 (2010).

. The panelists were foresighted as scientists had not yet derived human embryonic stem cells.

. See 142 Cong. Rec. S429-01 (1996).

. President Bush's policy was decidedly narrower than that of President Clinton, but it still authorized funding. Consequently, it must be said to violate the appellants’ reading of the Dickey-Wicker Amendment.

. When the dust settles and the votes are tallied, a majority of this panel supports two seemingly conflicting positions: (1) that law of the case doctrine prevents us from reconsidering the earlier ruling that applied Chevron and (2) that Chevron does not apply. Thus, the majority opinion stands only for the proposition that the earlier result need not be *790 overturned — not that the decision was correct in all respects.

. Snead, supra n. 3, at 1604.